In re Sharon Katheryne LANGESLAG, Debtor.

KYMN, Inc., a/k/a KYMN Radio, and Wayne Eddy, an Individual, Plaintiffs,

v.

Sharon Katheryne Langeslag, Defendant.

Bankruptcy No. 06–30455.
Adversary No. 06–3350.

United States Bankruptcy Court, D. Minnesota.

April 6, 2007.

See also 664 N.W.2d 860.

Michael John Corbin, Corbin Law Office, Faribault, MN, for Debtor.

Boris Parker, Bassford Remele PA, Margaret E. Noubissie, Saliterman & Siefferman PC, Minneapolis, MN, for Plaintiff.

## ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

GREGORY F. KISHEL, Chief Bankruptcy Judge.

This adversary proceeding came on before the Court on January 8, 2007, for hearing on the Plaintiffs' motion for summary judgment. The Plaintiffs [1] appeared by their attorneys, Floyd E. Siefferman and Margaret E. Noubissie. The Defendant ("the Debtor") appeared *pro se.* Based upon the record made for the hearing, including pre- and post-hearing written submissions and the arguments made at the hearing, the following order memorializes the disposition on the motion.

### BACKGROUND

To put it colloquially, these parties have been at it for a long time, at all levels of the Minnesota state court system and now here.[2]

In August, 1996, the Debtor began employment with KYMN, a Northfield, Minnesota-based radio station, as an outside salesperson. Eddy was the individual principal of KYMN. Eddy and the Debtor "had a combative and volatile relationship from the beginning." Their workplace interaction was characterized by frequent "heated arguments and shouting matches" and threats from the Debtor to sue Eddy and KYMN. 664 N.W.2d at 862. In Janu-

1. For brevity, references to the Plaintiffs as separate participants will use the form "KYMN" and "Eddy."

2. The following summary of background facts and litigation history is gleaned from *Langeslag v. KYMN, Inc.,* 664 N.W.2d 860 (Minn.

2003), plus the special verdict form and the findings of fact, conclusions of law, and order for judgment entered by the state trial court. The Debtor was represented by experienced counsel at all stages of the litigation in the Minnesota state courts.

ary, 1998 "Eddy was involved in an incident in KYMN's parking lot that led to his arrest" and the bringing of felony-level criminal charges against him. In connection with that, the Debtor gave a statement to the police and testified against Eddy at trial. As a result of the trial, Eddy was convicted of a petty misdemeanor.

At some point in 1997, Eddy ceased having weekly sales meetings for KYMN because the Debtor behaved disruptively during them. After that he gave the Debtor the opportunity to work from her home. After refusing to do so for the better part of two years, the Debtor took the offer in January, 1999.

In June, 1999, the Debtor sued Eddy and KYMN in the Minnesota state courts, seeking an award of damages premised upon various common-law theories in tort and breach of contract and on the Minnesota whistle-blower statute, the Minnesota Human Rights Act, and the Minnesota equal pay act. Eddy and KYMN pled counterclaims for intentional infliction of emotional distress, defamation, and intentional interference with contractual relationships. 664 N.W.2d at 863.

On October 28, 1999, Eddy terminated the Debtor's employment with KYMN, "citing her inability to work with other staff members and deficient job performance." *Id.*

The litigation went ahead in the state trial court. The Debtor's retaliation, defamation, and slander claims were taken out of suit, via grant of summary judgment or by voluntary withdrawal. After that, a bifurcated trial was conducted; it lasted more than three weeks. The Debtor's whistle-blower and human-rights claims were to be decided by the court, and all other claims and counterclaims were submitted to a jury. Ultimately, the state-court judge held for KYMN and Eddy on

the Debtor's two statutory causes of action. The jury rendered a verdict against the Debtor and in favor of KYMN and Eddy on the remaining issues. Specifically, KYMN and Eddy were not found liable to the Debtor at all; KYMN and Eddy were awarded $100,000.00 from the Debtor on their defamation claim; KYMN was awarded $75,000.00 from the Debtor on its claim for intentional interference with its contractual relationships with its employees and clients; and Eddy was awarded $535,000.00 from the Debtor on his claim for intentional infliction of emotional distress.

The Debtor appealed. In an unpublished decision, reported in electronic format at 2002 WL 31370476 (Minn.Ct.App. 2002), the Minnesota Court of Appeals affirmed the trial court in all respects.

The Debtor then petitioned the Minnesota Supreme Court for review, "alleging that the [C]ourt of [A]ppeals erred in concluding that the [trial] court properly submitted Eddy's counterclaims to the jury, and erred in affirming the [trial] court's finding that Eddy did not violate" the Minnesota human-rights and whistle-blower statutes. 664 N.W.2d at 864.

The Minnesota Supreme Court granted review on only one issue: "whether the [trial] court erred in submitting Eddy's counterclaim for intentional infliction of emotional distress to the jury." *Id.* Applying the standards that it had developed since it first recognized that tort in 1983, the Supreme Court concluded that "the lack of evidence of extreme and outrageous conduct" as defined under its precedent and that "the lack of a causal connection between the conduct and Eddy's emotional distress [were] dispositive." 664 N.W.2d at 865. Thus, it held that the trial court had erred when it denied the Debtor's motion for dismissal on that count and then sub-

mitted it to the jury. 664 N.W.2d at 870. The Supreme Court reversed and remanded to the trial court for the entry of a conforming judgment, on that count. *Id.*

Several years later, the Debtor filed for relief under Chapter 7 in this court, on March 21, 2006. Eddy and KYMN timely commenced this adversary proceeding.[3] They seek a determination that the debts of the Debtor to them, as reduced to final judgment in the Minnesota state courts, were excepted from discharge in the Debtor's bankruptcy case.

## NATURE OF MOTION

 KYMN and Eddy now move for summary judgment on their request for determination of dischargeability. The motion, of course, is governed by Fed. R.Civ.P. 56, as incorporated by Fed. R. Bankr.P. 7056.[4] The doctrine of collateral estoppel, or issue preclusion, applies when the parties to a dischargeability proceeding in a bankruptcy case have gone through pre-petition litigation in a non-bankruptcy forum and have received a judgment against the debtor on the underlying debt. It binds the debtor on those issues of law or fact that are common to both proceedings, and that were settled by adjudication in the earlier proceeding. If the preclusive findings from the earlier proceeding are sufficient to establish all of the elements of nondischargeability on the specific theory pleaded in the bankruptcy court, the plaintiff then is entitled to entry of judgment that the debt is nondischargeable, as a matter of law and without the need for further development of evidence. *In re Scarborough,* 171 F.3d 638, 643 (8th Cir.1999); *In re Cochrane,* 124 F.3d 978, 983 (8th Cir.1997); *In re Miera,* 926 F.2d 741, 743 (8th Cir.1991).[5] *See also In re Yanke,* 225 B.R. 428, 436–437 (Bankr. D.Minn.1998), *aff'd,* 230 B.R. 374 (8th Cir. BAP (Minn.) 1999) (summary judgment is warranted where all material facts have been settled by final order or judgment entered in the same or another forum, and only question remaining is application of different law to those established facts). The existence of the basic, underlying liability is settled by the doctrine of res judicata, or claim preclusion; the pre-petition entry of a final judgment in a state court that fixed and liquidated the liability prohibits a defendant in a dischargeability

---

3. The Debtor filed her petition under Chapter 7 on March 21, 2006. In accordance with Fed. R. Bankr.P. 4007(c), the clerk gave notice that the deadline for the filing of complaints for the determination of dischargeability of debt was June 19, 2006. Counsel for the Plaintiffs filed their client's complaint on June 19, 2006. As early as her *pro se* amended answer filed on August 18, 2006, the Debtor took issue with the way the Plaintiffs had commenced this adversary proceeding, challenging by turns its timeliness and the adequacy of service. The Debtor was directed at a Rule 16 conference to bring the issue before the court by written motion. She never did that. At the hearing on the motion at bar, she made an oral demand for dismissal, arguing the same issues in a vague and confusing way. This request was denied on its merits from the bench. That disposition is reflected in an order entered on January 11, 2007.

4. In pertinent part, this rule provides that, on a motion under Rule 56,

 [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

5. All three of these decisions relied on *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). In *Grogan v. Garner,* the Supreme Court reaffirmed its earlier holdings that collateral estoppel lies in dischargeability proceedings in bankruptcy cases, to bar the relitigation of factual or legal issues decided in a pre-bankruptcy state-court lawsuit.

proceeding from challenging the existence of the debt and from raising defenses to liability that were available in the state-court lawsuit. *In re Brandl,* 179 B.R. 620, 627 (Bankr.D.Minn.1995).[6]

The Plaintiffs base their motion on the application of collateral estoppel, and that alone. They maintain that all fact issues relevant to the dischargeability of the Debtor's debts to them were settled by the determinations of the Minnesota state courts, and that on those facts they are entitled to a judgment of nondischargeability.

In her response the Debtor raises numerous points. Some are material to the theory of the Plaintiffs' motion and many are not.

## DISCUSSION

Given the way the parties presented the issues, the appropriate starting point is the legal standard for nondischargeability under the statutory authority pleaded by the Plaintiffs. That standard will be applied separately to the distinct components of the pre-petition final judgment, with reference to the findings of fact that went to each count.[7]

### I. Standard of Nondischargeability Under 11 U.S.C. § 523(a)(6).

The Plaintiffs rely solely on 11 U.S.C. § 523(a)(6) for their theory of nondischargeability. That statute provides an exception from discharge in bankruptcy for any debt "... for willful and malicious injury by the debtor to another entity or to the property of another entity ..."

There is no dispute that the Debtor's acts inflicted "injury" on KYMN and Eddy, in a broader sense; the fixing and liquidation of liability under state tort law required findings to that effect. For the purposes of dischargeability, the issue is whether the Debtor harbored both willfulness and malice when she did so. The statute requires a plaintiff-creditor to prove both states of mind. *In re Scarborough,* 171 F.3d at 641; *In re Geiger,* 113 F.3d 848, 852 (8th Cir.1997), *aff'd, Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998); *In re Miera,* 926 F.2d at 744–745.

Since the 1978 enactment of the Bankruptcy Code, the courts have struggled to frame meaningful definitions for "willful" and "malicious" under this statute that can be applied to the imprecise and often messy events of real life. This is not surprising; the words having a far more connotative than denotative nature from the standpoint of "plain meaning" analysis.

The United States Supreme Court addressed the first prong of the statute's intent requirement in *Kawaauhau v. Geiger.* There, it held that, to have acted willfully under § 523(a)(6), a debtor must have contemplated "a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." 523 U.S. at 61 and n. 3, 118 S.Ct. 974 (emphasis in original). Under this formulation, the statutory requirement of willfulness serves as a cleaving line between torts of intent and torts of negligence or

---

**6.** Thus, the Debtor was entirely off-base in rearguing various issues under nonbankruptcy law, that went to whether she was liable to the Plaintiffs at all.

**7.** This means the two counts and component debts that were left standing after the Minnesota Supreme Court's disposition. Eddy's third claim, for intentional infliction of emo-

tional distress, is now entirely off the table. Though the record does not contain any documents to formally evidence it, the state trial court apparently did vacate the portion of its judgment on that theory of recovery and found the defendant not liable on its count, as the Minnesota Supreme Court had mandated.

even recklessness. The former bode non-dischargeability under § 523(a)(6) and the latter do not. 523 U.S. at 64 and 61–62, 118 S.Ct. 974 (at the latter, relying on Restatement (Second) of Torts § 8A (1964)).[8]

As to the second prong, in a different factual context the Eighth Circuit had earlier linked the states of mind with the character of the debtor's *conduct* in relation to the creditor. Willfulness was identified with "headstrong and knowing conduct" and maliciousness was identified with "conduct ... targeted at the creditor ... at least in the sense that the conduct is certain or almost certain to cause ... harm." *In re Long*, 774 F.2d 875, 881 (8th Cir.1985).[9] Recognizing that the latter half of this formulation was prone to drift away from the understanding of a strictly intentional tort, the Eighth Circuit later noted that malice "requires more than just reckless behavior by the debtor." *In re Scarborough*, 171 F.3d at 641 (citing *In re Miera*, 926 F.2d at 743).

Even with these several formulations, the trial courts still struggled with the conundrum of culpability that dischargeability proceedings present; as enunciated, they did not fully, really illuminate just what had to be proven by way of a debtor's express intention toward his creditor's interests, for the establishment of malice in the creation of a debt.

For this jurisdiction, at least, greater clarity was first suggested by *In re Dziuk*, 218 B.R. 485 (Bankr.D.Minn.1998). The *Dziuk* court took a page from the appellate

courts' reliance on the Restatement in construing § 523(a)(6), when it held that, for a creditor to satisfy both of the intent elements of § 523(a)(6), "the debtor must have intended both the injury and the harm." 218 B.R. at 487 (omitting footnotes; citing *In re Geiger*, 113 F.3d at 852 and 854). Citing the definitions of Restatement (Second) of Torts at §§ 7(1) and 7(2) respectively, the *Dziuk* court identified "injury" as "the invasion of any legally protected interest of another," and "harm" as "the existence of any loss or detriment in fact of any kind to a person resulting from any cause." 218 B.R. at 487, nn. 3 and 4.

■ Several years later, the Bankruptcy Appellate Panel for the Eighth Circuit imported the *Dziuk* construction of § 523(a)(6) into its jurisprudence. *In re Stage*, 321 B.R. 486 (8th Cir. BAP (Mo.) 2005).[10] The *Stage* panel reiterated that the Restatement "makes a distinction between injury and harm," with "injury" equating to "an invasion of a legally protected interest." Citing *Kawaauhau v. Geiger*, it observed that willfulness is manifested by an intent to deliberately bring about that invasion. 321 B.R. at 492–493. Expanding on the more summary pronouncement in *Dziuk*, the *Stage* panel recognized the nature of "harm" as a resulting "loss or detriment *in fact* of any kind to a person resulting from any cause." (emphasis added.) Then it related that back to malice's variety of intent: "[I]t is the intent to cause *harm* which must exist for an injury to be malicious. The mali-

---

**8.** The Eighth Circuit had reached essentially the same conclusion in an earlier decision. *Cassidy v. Minihan*, 794 F.2d 340 (8th Cir. 1986).

**9.** *Long* involving a debtor who had intentionally spent the proceeds of the collection of encumbered accounts receivable of his distressed business on other expenses of opera-

tion, without the authorization or the knowledge of the creditor to which they had been pledged.

**10.** The author of both decisions was the Honorable Robert J. Kressel of the District of Minnesota, by then Chief Judge of the Bankruptcy Appellate Panel for the Eighth Circuit.

ciousness element is satisfied if, in committing the intentional tort, the perpetrator intended the resulting harm, or the harm was substantially certain or nearly certain to result." 321 B.R. at 493 (citing *In re Waugh*, 95 F.3d 706, 711 (8th Cir.1996) and *In re Long*, 774 F.2d at 881).[11]

█ The holding of these decisions can be phrased in a more homely fashion: if the debtor was aware of the plaintiff-creditor's right under law to be free of the invasive conduct of others (conduct of the sort redressed by the law on the underlying tort) and nonetheless proceeded to act to effect the invasion with particular reference to the plaintiff, willfulness is established. If in so doing the debtor intended to bring about a loss in fact that would be detrimental to the plaintiff, whether specific sort of loss the plaintiff actually suffered or not, malice is established. Upon those showings, the debt that arises under law to compensate the plaintiff for that loss is nondischargeable.

## II. Application of Collateral Estoppel to State Court Verdict.

█ When applying collateral estoppel to a jury verdict, the task is to glean the specific findings on which the jury based its verdict. Where the special interrogatories submitted to the jury were not broken down to specific elements of

the claims or defenses in suit, one must determine whether, as a matter of logic, there was only one set of possible findings on those elements that could support the verdict actually rendered. This requires a close inspection of the trial judge's instructions to the jury. If, in framing up the governing law, the instructions permitted an adjudication of liability on one and only one set of specific, predicate fact-findings, the only inference is that the jury found those facts. If they permitted a grant of verdict through alternate findings on particular elements of a claim or defense, and the special interrogatories did not require a disclosure of the jury's choice, no such inference can be made. In that instance, when collateral estoppel is invoked in a later legal proceeding, the second court may well be unable to conclude that a fact issue going to a particular element of the claim before it was settled by the prior judgment.

█ In the matter at bar, this process would specifically go to the requirement of collateral estoppel that the fact issue in question was identical to one involved in the prior adjudication. *See, e.g., Northwestern Nat'l Life Ins. Co. v. County of Hennepin*, 572 N.W.2d 51, 54 (Minn.1997); *Haavisto v. Perpich*, 520 N.W.2d 727, 731 (Minn.1994); *Willems v. Comm'r of Public Safety*, 333 N.W.2d 619, 621 (Minn.1983).[12]

11. This formulation echoed *Long's* recognition of the likelihood of harm as a circumstance relevant to the fact-finding on the malice element. Of course, objective likelihood of harm also bears on a perpetrator's recklessness; but the existence of recklessness is not sufficient to satisfy the element of malice. To avoid the segue back, it is most appropriate to view the objective likelihood of harm from a particular act of the debtor as a unit of circumstantial evidence that could support an inference of directed intent to cause that harm—at least if coupled with evidence that the debtor actually knew of the likelihood or risk.

12. The Federal Full Faith and Credit Act, 28 U.S.C. § 1783, requires the federal courts to apply the preclusion doctrines as they are framed by the law of the forum of the original adjudication, if that is a state court. *Marrese v. Am. Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985); *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 481–482, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982); *Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Minnesota law's other three requirements for collateral estoppel under the cited decisions are not and cannot possibly be in controversy here; there was a final judgment

*III. Substantive Application of § 523(a)(6) to the Two Components of the State Court Verdict and Judgment.*

After a lengthy trial, the jury in the state court rendered a verdict in favor of KYMN on its claim against the Debtor for tortious (or intentional) interference with its contractual relationships with its employees and its customers, and in favor of Eddy on his claim against the Debtor for defamation. The question on this motion is whether that verdict and the judgment entered on its subsumed findings of fact satisfy all of the elements of nondischargeability, as to the two component debts reduced to judgment.

*A. KYMN's Judgment for Intentional Interference with Contractual Relationships.*

■ On the matter of liability under this count of the Plaintiff's counterclaim, the state trial court put only one special interrogatory to the jury:

Did Sharon Langeslag intentionally interfere with any contractual relationship existing between KYMN, Inc. and employees of the radio station and/or clients of the radio station?

The jury answered "yes" to this question, and then awarded $75,000.00 to KYMN as damages.

Standing alone, the adjudication in this response is almost no help. However, the judge had instructed the jury on the elements of tortious interference with contractual relationships, an intentional tort under Minnesota law. *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 362 (Minn.1998).

Under those instructions, the jury was required to find the following facts to support a verdict for KYMN on this claim:

1. The Debtor knew about KYMN's contractual relationships with relevant customers or employees.

2. The Debtor interfered with the performance under those contracts or "caused the breach of the contract[s]," with intent in the sense that she "want[ed] to cause the consequence of her ... acts [of interference] or [knew] that ... her acts [were] substantially certain to cause those consequences ..."

3. The Debtor acted with actual malice toward KYMN, i.e., "the purpose [of her interfering communications to customers or employees was] to injure a person and it [was] made with ill-will and improper purposes or it [was] made without cause and without regard for the consequences ..."[13]

There were no instructions permitting an adjudication of liability under an alternate set of facts. Thus, the only inference is that the jury made findings to this effect on all of these points to reach its verdict. The procedural history makes this inference unassailable: in denying the Debtor's motion for directed verdict the trial judge had concluded that there was enough evidence in the record to support such findings; and the Minnesota Court of Appeals held that he did not err in doing so.

So, there is a platform of predicate findings going to the factual issue of the Debtor's intent. The question then is whether the jury found the same sort of intent that

(affirmed on appeal), the Debtor was very much a party to the earlier litigation, and she had every "full and fair opportunity to be heard" on these issues of fact, at three different levels of the Minnesota state courts.

13. This summary and these quotations are from pages 1804–1805 of the transcript of the state-court trial, placed into the record for this motion under the Affidavit of Margaret E. Noubissie in Support of Plaintiffs' Motion for Summary Judgment [Dkt. No. 17].

§ 523(a)(6) requires for nondischargeability.

On its face, the terminology of the state law applied by the jury is corollary to that of the judicial construction of § 523(a)(6). There is some interposition of basic concepts between the two elements of "intent" (which is to be equated with willfulness under § 523(a)(6)), and "malice." But given that, the conceptual crossover evens out as a matter of logic. And, the findings that must be inferred meet both intent elements of the federal law to be applied here.

In that part of their process that is relevant to the willfulness element of § 523(a)(6), the jury found that the Debtor was aware of KYMN's contractual relationships with its advertising customers and employees, and that her deliberately meddlesome behavior interfered with the performance under those contracts, causing damage to KYMN.[14] Under the state court's instruction on the nature of intentional tort, the jury was required to find that the Debtor intended to sunder these established relationships under contract, in order to render its verdict. It is now inferred that it did so. This equates to the *Stage* formulation of willfulness as an intent to invade a legally-protected interest, here KYMN's expectation that a third party would perform under its contract with KYMN.

As to malice under § 523(a)(6), the jury had to have found one of two things: that the Debtor knew that her vexatious behavior was "substantially certain" in an objective sense to induce third parties to back out of their contracts with KYMN, or that she actually wanted to bring about that result. As a salesperson herself, the Debt-

or was well aware that this would result in less revenue for KYMN, or would lead to the departure of other, valued employees who could not abide the environment that she was creating.

The jury then must have made the inference that she went ahead to deliberately bring about that economic detriment, that loss of business or workforce. The state court's instruction on "actual malice" required a finding of a purpose to "injure" in the sense of state law, a harboring of "ill will *and* improper purpose," or a lack of any independent and positive cause for her actions and a heedlessness of the consequences for KYMN. As between the two intent elements under state law, the conceptual overlap of possible findings on state of mind required the jury to find an intent on the Debtor's part to actually bring about the harm, i.e., the economic loss that KYMN did incur, in order to render the verdict that it did. It is now inferred that they made this finding. This state of mind was "malicious" under the *Stage* formulation.

So the jury findings that supported its verdict meet § 523(a)(6), as to KYMN's judgment against the Debtor. KYMN is entitled to a judgment that the underlying debt was excepted from discharge in the Debtor's Chapter 7 case.

*B. Eddy's Judgment for Defamation.*

In the state court, the special interrogatory that went to Eddy's claim for defamation read as follows:

Did Sharon Langeslag defame Wayne Eddy and/or KYMN Radio as alleged in their counterclaim against Sharon Langeslag?

Not a word in this instruction goes to the Debtor's contemporaneous intent. As a

---

14. The damage award directly corresponded to the testimony on the amount of lost advertising revenue during the term of the Debtor's employment; and KYMN lost the services of at least two other employees, who resigned due to the disruption that the Debtor was causing. 2002 WL 31370476, n. 5.

result, the jury's affirmative answer to this question is even less helpful than the one on the other count. Applying the earlier analysis of the content of jury instructions, however, requires a different outcome for this motion, as to Eddy's judgment on the defamation count.

Simply stated, given the content of the jury instructions and the form of the special interrogatory on the defamation count, there is more than one possible inference as to the jury's finding on the Debtor's intent when she communicated (in the parlance of the law of defamation, "published") defamatory statements about Eddy.[15] The defendant's state of mind in making the publication is material to the issues of liability for defamation and damages, in some contexts. Here, the trial judge instructed the jury on the issue of the Debtor's intent in the alternative, with reference to both "[i]ntentional publication" and "[n]egligent publication." The former was identified as occurring when a defendant has the actual purpose of communicating the defamation to third parties or has knowledge that the statement "is substantially certain to be communicated," and the latter "if a reasonable person would recognize that the defamatory matter might be communicated to a person other than" the subject plaintiff.[16]

Clearly, the jury was given the option of imposing liability on the Debtor on a finding of either state of mind as it bore on the act of publication. However, nothing in the record here reveals which option the jury elected in its fact-finding.

This prevents Eddy from receiving summary judgment on the dischargeability of his state-court judgment; collateral estoppel cannot lie on the record at bar. The reason can be characterized in at least two ways. First, there is no clearly-articulated finding of fact on specific intent, that could be matched to bankruptcy law's requirements. Second, on the face of the generically-worded special interrogatory, it is at

15. Under the law of defamation, the actionable conduct is the publication of a defamatory statement to third parties whose opinions of the plaintiff would be altered. *Richie v. Paramount Pictures Corp.*, 544 N.W.2d 21, 25 (Minn.1996); *Rouse v. Dunkley & Bennett, P.A.*, 520 N.W.2d 406, 411 (Minn.1994); *Church of Scientology of Minn. v. Minn. State Med. Ass'n Found.*, 264 N.W.2d 152, 156 (Minn.1978); *Northwest Airlines, Inc. v. Friday*, 617 N.W.2d 590, 594 (Minn.Ct.App. 2000); *Ferguson v. Michael Foods, Inc.*, 74 F.Supp.2d 862, 872 (D.Minn.1999).

16. This summary and these quotations are from p. 1806 of the transcript of the state-court trial. From the record here, one cannot tell why the issue of intent was framed in terms of a defendant's volition in the act of effecting a publication, rather than with reference to the defendant's contemporaneous knowledge of the truth or falsity of the statement published. By and large, under current law, the question of intent in a defamation case focuses on the latter, and legally bears on the heightened burdens that a defamation plaintiff may bear under the First Amendment analysis of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). *See Jadwin v. Minneapolis Star and Tribune Co.*, 367 N.W.2d 476, 492 (Minn. 1985) (if defamed plaintiff is public figure, he must prove actual malice on part of defendant to recover; if plaintiff is not public official or public figure, she may recover on showing that defendant "acted negligently in publishing the defamatory matter."). With an opaque record here, and particularly given that the Debtor has not made an issue of it, there is no warrant for delving further into state law to figure out the rationale of the instructions' phrasing. The Debtor's counsel did not take issue with it at any stage of the state-court litigation. Thus, at this point, it must be assumed that the instruction was properly framed and supported in law; that there was some basis for submitting an option on this fact issue to the jury; and that the exercise of that option during fact-finding was necessary to the rendering of the verdict.

least as likely as not that the issue actually decided by the jury was not identical to the issue raised by § 523(a)(6).[17]

It cannot be said that all of the factual elements of Eddy's case under § 523(a)(6) were settled by the state court's judgment on his defamation claim. He is not entitled to summary judgment on the dischargeability of the Debtor's debt to him. That request for relief will have to go to trial.[18]

## IV. Disposition.

The outcome on the Plaintiffs' motion triggers Fed.R.Civ.P. 54(b):

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.[19]

The federal trial courts are to avoid structuring their decision-making processes so as to create a prospect of "piecemeal appeals." This Rule reflects that. Thus, it is only the "special case" in which the Rule 54(b) certification is to be made, so as to direct the entry of judgment before all issues in suit are decided. *Hardie v. Cotter and Co.*, 819 F.2d 181, 182 (8th Cir.1987). This is not such a special case. Given the intertwining of the two counts of the Plaintiffs' complaint for nondischargeability in the events that spawned them, the entry of any final judgment will be deferred until both aspects of this adversary proceeding are finally adjudicated on their merits.

Thus, entry of judgment as to the dischargeability of the Debtor's debt to

---

**17.** In post-hearing briefing filed on January 16, 2007, Eddy's counsel points to certain findings made by the state-court judge in his separate written decision on the Debtor's statutory claims against the Plaintiffs. She argues that these are enough to establish willfulness and malice alike on the part of the Debtor, under the *Stage* formulation. She is correct that the facial content of these findings does logically go to the existence of a more generalized, malign animus on the part of the Debtor, against the Plaintiffs. However, these findings in their entirety were apparently made on evidence beyond that given to the jury, received during several additional days of trial to the state-court judge alone. The findings were focused on the events relevant to the Debtor's claim that *Eddy* had done *her* wrong, personally and through the instrumentality of KYMN. As between the sides, that claim ran opposite of the one here. Some of the basic facts may have been common to the cross-running claims, but the Plaintiffs' counsel has done nothing to demonstrate how the ones she cites could have been material to the existence of the entirely separate debt in question here. And, in the last instance, the very best reason for imposing a quarantine between the state-court fact-

finding on the debt involved here, and the adjudications made on the other, cross-running claim, is that they went ahead through *separate, isolated, and very different processes of fact-finding*, each confined to the fact issues material under the law governing the subject claims. There is no basis in law or fairness for transplanting fact-finding from a separate, coordinate adjudication, to apply to the debt in question here. (For the same reasons, the Debtor's citation to various aspects of the Minnesota Supreme Court's rulings is unjustified. The fact that that court found Eddy's evidence insufficient to merit a recovery for intentional infliction of emotional distress does not mean his proof will not meet the different substantive requirements of § 523(a)(6), as to her adjudged liability for defaming him.)

**18.** The split outcome here cannot be pleasing to either side. But, it was mandated by the way in which the outcome in the state-court lawsuit was structured and memorialized, There simply was no basis for a winner-take-all finale to this motion.

**19.** This Rule is made applicable to this adversary proceeding by Fed. R. Bankr.P. 7054(a).

KYMN is not being directed at this time. The consequence is that today's determination on that matter will not be appealable of right until the ruling on the other issue, after trial.

### ORDER

On the decision just memorialized,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. The Defendant's debt to Plaintiff KYMN, Inc. in the amount of $75,000.00, as fixed and liquidated in the Minnesota State District Court for the Third Judicial District, Rice County, in an action under the caption of *Langeslag v. KYMN, Inc., et al.,* Court File No. C1–99–892, together with all interests, costs, and other obligations ancillary to it, was excepted from the discharge granted to the Defendant in BKY 06–30455, by operation of 11 U.S.C. § 523(a)(6).

2. The Plaintiffs' motion for summary judgment is denied in all other respects.