In re Salwa Georges **KHOURI**, Debtor.

**State of New York, Plaintiff,**

v.

**Salwa Georges Khouri, Defendant.**

**Bankruptcy No. 07–33728.**
**Adversary No. 07–3230.**

United States Bankruptcy Court, D. Minnesota.

Nov. 17, 2008.

Stephen M. Nagle, Office of the NYS Attorney General, Civil Recoveries Bureau, Albany, NY, for Plaintiff.

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding for determination of dischargeability of debt came on before the Court on September 30, 2008, on the Plaintiff's motion for summary judgment. The Plaintiff appeared by Stephen M. Nagle, Assistant Attorney General, State of New York. The Defendant appeared *pro se.* The Defendant had not filed a written response to the motion. The following decision is based upon the Plaintiff's motion and its documentary support, the arguments presented at the hearing, and other relevant parts of the record in this adversary proceeding.

The Plaintiff ("the State of New York" or "the State") appears here in its capacity as administrator of the New York State

Medical Assistance Program ("Medicaid"), through its Department of Social Services and later through its Department of Health. The Defendant ("the Debtor") is a physician. She maintained an office in the New York City metropolitan area in the late 1980s. During her medical practice in New York, the Debtor participated in the Medicaid program as a provider of patient services. In that capacity, she submitted claims to the State of New York for "billed services" (i.e., physician services that she herself provided to patients covered by Medicaid). She also obtained "ordered services" for her patients, i.e., other goods or services provided by third parties, such as diagnostic testing and prescribed medication.

In early 1989, the New York State Department of Social Services conducted an audit of the Debtor's records for patients covered under Medicaid. The purpose of the audit was to determine the Debtor's compliance with billing and record-keeping requirements of the program. As a result of that audit, on July 7, 1989 the Department issued a "Notice of Proposed Agency Action under the Medical Assistance Program" to the Debtor. In that document, the Department set forth its tentative determination to exclude the Debtor from participation in the New York State Medicaid program as a provider for a period of five years. It also proposed to seek restitution of alleged overpayments of Medicaid funds to the Debtor and at her order, in the amount of $428,963.18 plus interest.[1] The stated reason was that the Debtor had "engaged in unacceptable practices and [had] caused Medicaid overpayments, in addition to overpayments received by" her. The notice recited that the Debtor had violated specified provisions of applicable New York State regulations, those that banned "[f]alse claims"; "[u]nacceptable recordkeeping" in connection with service provision to Medicaid recipients; "[e]xcessive services"; and "[f]ailure to meet recognized standards" of health care in services rendered to Medicaid recipients.

The Debtor responded to the notice, and objected to the Department's proposal for action. On October 27, 1989, the Department made its determination to exclude the Debtor from participation in Medicaid and to seek restitution from her.[2]

The Debtor retained an attorney and appealed the Department's decision via its administrative processes. A hearing on the appeal was conducted before an administrative law judge on seven separate days scattered over a 26–month period, from late September, 1994 through late November, 1996. On February 20, 1997, a written "Decision After Hearing" was entered. This document was captioned in the New York State Department of Social Services. It was signed by an officer of the "Office of Administrative Hearings." The signatory was not the same person as the administrative law judge who had presided over the hearing.[3]

In sum, under this decision:

1. The Department's "determination that [the Debtor] received Medicaid overpayments [was] affirmed."

2. The Department's "determination that [the Debtor] caused Medicaid over-

---

1. It proposed to seek this full amount from the Debtor, though she herself had not received the funds attributable to the "ordered services."

2. In this determination, the amount to be recovered was stated as $427,642.18.

3. For brevity, this document will be called "the ALJ's decision," and findings of fact therein "the ALJ's finding(s)."

payments to be made to dispensing and service providers [was] affirmed."

3. The amount of the overpayment was determined as $401,976.00.

4. The Department's exclusion of the Debtor from participation in the Medicaid program for five years was affirmed.

The Debtor did not seek judicial review of this decision in the courts of the State of New York. Nor did she seek any other form of relief via the processes of any administrative agency. All periods for doing so under New York State statute or regulation have long since lapsed.

The Debtor filed a voluntary petition under Chapter 7 in this Court on October 5, 2007. She scheduled the State of New York as a creditor, on account of its claim for recovery of Medicaid overpayments.

The State of New York timely commenced the adversary proceeding at bar. The State seeks to have the Debtor's debt to it excepted from discharge in the underlying Chapter 7 case. It cites 11 U.S.C. §§ 523(a)(2), 523(a)(4), and 523(a)(6) as the statutory bases for nondischargeability.

The State now moves for summary judgment. This motion is governed by Fed. R.Civ.P. 56, which is incorporated by Fed. R. Bankr.P. 7056. The requirements for obtaining summary judgment are set forth in Fed.R.Civ.P. 56(c).[4]

A platform of undisputed facts is the threshold requirement under Rule 56(c). The movant must demonstrate there is "no genuine issue of material fact," i.e., a lack of any triable disputes as to the facts material to the claims or defenses as to which the motion is brought.

To do this, the State invokes the doctrine of collateral estoppel, or issue preclusion. It argues that the Debtor is bound by all of the findings of fact made by the ALJ to support the determination of the Department of Social Services, as the legal equivalent of findings made by a court in a civil lawsuit.[5] The State then argues that the ALJ's findings meet all of the elements of one or more of its pleaded bases for nondischargeability under the Bankruptcy Code, meriting entry of judgment in its favor "as a matter of law."

■ It is long-established that the doctrine of collateral estoppel, or "issue preclusion," applies in dischargeability proceedings in bankruptcy, to bar a party

---

4. In pertinent part, this rule provides that, on a motion under Rule 56,

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

5. The State maintains that New York law makes the final determination of the Department of Social Services the equivalent of a civil judgment, citing N.Y. Soc. Serv. Law § 145–a. This statute supports the State's position. Para. 2 of N.Y. Soc. Serv. Law § 145–a (McKinney 2008) authorizes the Commissioner of Social Services to file, with the clerk of the appropriate county, a certified copy of any "final administrative determination of the commissioner-or other final determination that [a] provider has engaged in unacceptable practices or has received payment to which such provider is not entitled, containing the amount found to be due." The commissioner may do this as long as "no administrative hearing or proceeding for judicial review [is] then pending, and ... the time for initiation of such hearing or proceeding [has] expired." After that, the "filing of such final administrative determination shall have the full force and effect of a judgment duly docketed in the office of such clerk," and it will be enforceable under the rules applicable to money judgments in the New York courts. The Debtor does not dispute the effect of this statute. And, she does not deny that the State took the ministerial steps to give itself the benefit of it, i.e., the filing of the ALJ's decision with a county clerk.

from relitigating discrete issues of fact that were settled via adjudication in pre-bankruptcy litigation to which the debtor was a party. *In re Porter,* 539 F.3d 889, 894 (8th Cir.2008); *In re Madsen,* 195 F.3d 988, 989 (8th Cir.1999); *In re Scarborough,* 171 F.3d 638, 643 (8th Cir.1999); *In re Cochrane,* 124 F.3d 978, 983 (8th Cir.1997); *In re Miera,* 926 F.2d 741, 743 (8th Cir.1991).[6] *See also In re Yanke,* 225 B.R. 428, 436–437 (Bankr.D.Minn.1998), *aff'd,* 230 B.R. 374 (8th Cir. BAP 1999) (summary judgment is warranted where all material facts have been settled by final order or judgment entered in the same or another forum, and only question remaining is application of different law to those established facts); *In re Langeslag,* 366 B.R. 51, 56 (Bankr.D.Minn.2007).

■ Under the Federal Full Faith and Credit Act, 28 U.S.C. § 1783, the federal courts are to apply the preclusion doctrines as they are framed by the law of the forum of the original adjudication, if that is a state court. *Marrese v. Am. Academy of Orthopaedic Surgeons,* 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985); *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 481–482, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982); *Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). *See also In re Scarborough,* 171 F.3d at 641 (Full Faith and Credit Act applied to dischargeability proceeding in bankruptcy case).

For a party to be entitled to summary judgment, it must demonstrate that there is *"no* genuine issue of *material* fact." The emphasis just noted has a particular resonance where a movant for summary judgment relies exclusively on issue preclusion to establish a lack of triable disputes of fact.

For the purposes of Rule 56, the materiality of facts turns on their logical nexus to the essential elements of the claim or defense at issue in the motion. The inquiry is whether the specific points of fact satisfy those elements, as the elements are defined by the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (under Rule 56, materiality of a particular fact is measured by whether its existence would "affect the outcome of the suit under the governing law"). So, to meet its burden, a plaintiff that relies on collateral estoppel to seek summary judgment on its own affirmative claim must identify specific findings in the original, predicate decision that were made to support the outcome there. Then, it must link them to the elements of its claim in the current proceeding, in logical satisfaction of those elements. Only then will all material facts have been established.[7] If the facts thus settled do meet all of the elements of the current claim, the plaintiff will be entitled to a grant of summary judgment.[8]

6. These decisions are founded on *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). In *Grogan v. Garner,* the Supreme Court reaffirmed its earlier holdings that collateral estoppel lies in dischargeability proceedings in bankruptcy cases, to bar the relitigation of factual or legal issues decided in a pre-bankruptcy state-court lawsuit.

7. Put another way, the respondent having already had its one day in court on these facts, it will be precluded from denying their existence.

8. By contrast, a defendant invoking collateral estoppel to move for summary judgment in its favor on a plaintiff's claim need identify only one finding in the predicate decision that cuts conclusively against the existence of one of the essential elements of the current claim. For want of an ability to relitigate, and therefore prove, one element, a plaintiff may suffer an adverse grant of summary judgment. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Under New York law, "[t]wo requirements must be met before collateral estoppel can be invoked. There must be an identity of issue which has necessarily been decided in the prior action and is decisive of the present action, and there must have been a full and fair opportunity to contest the decision now said to be controlling." *Buechel v. Bain*, 97 N.Y.2d 295, 740 N.Y.S.2d 252, 766 N.E.2d 914, 919 (2001), *cert. denied*, 535 U.S. 1096, 122 S.Ct. 2293, 152 L.Ed.2d 1051 (2002). *See also D'Arata v. New York Cent. Mutual Fire Ins. Co.*, 76 N.Y.2d 659, 563 N.Y.S.2d 24, 564 N.E.2d 634, 636 (1990); *Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 492 N.Y.S.2d 584, 482 N.E.2d 63, 67 (1985); and *Gilberg v. Barbieri*, 53 N.Y.2d 285, 441 N.Y.S.2d 49, 423 N.E.2d 807, 809 (1981). The respondent to an assertion of preclusion "bears the burden of demonstrating the absence of a full and fair opportunity to contest the prior determination." *Buechel v. Bain*, 740 N.Y.S.2d 252, 766 N.E.2d at 919. The party asserting collateral estoppel "must demonstrate that the decisive issue was necessarily decided in the prior action" against the respondent. *Id.*

In her answer, the Debtor stated that she "had no recourse to adequate representation, and use of independent physicians" to counter the State's case in the agency proceeding. This, she said, left her "hardly any chance of proper defense." She repeated these points in her oral argument for the motion at bar, but in no more detail than before.

In isolation, these statements are too conclusory. They have no evidentiary weight or persuasive strength in themselves. And countering them are the actual circumstances that evidence a relative fullness of opportunity to avoid an adverse administrative determination: the Debtor was represented by an attorney throughout the evidentiary process; the hearing seems to have lasted as long as seven full days, scattered though they may have been; and the Debtor had a detailed actual notice of the nature of the charges that the Department of Social Services was making against her, nearly five years before the administrative law judge actually convened the hearing.[9]

The Debtor has not carried her burden as respondent on the procedurally-oriented requirement for collateral estoppel under New York law. In this sense, then, she is bound to the ALJ's fact-finding.

The other requirement of collateral estoppel under New York's iteration is a different matter. The New York courts have held that the fact-finding in the original, predicate decision must be material in two different ways. First, it must have been necessary to the original adjudication.[10] And, it must be "decisive to the present action," i.e., it must be directly probative of an essential element of the claim or defense now in suit.

This is where the essential elements of the State's several pleaded theories of nondischargeability come into play.

The State relies most heavily on 11 U.S.C. § 523(a)(2)(A). This statute creates an exception from discharge for any

---

9. In oral argument here, the Debtor admitted that contesting the administrative proceeding had given her an additional seven years of medical practice before she was actually debarred from participation in Medicaid or subjected to the overpayment adjudication.

10. Put another way, extraneous or gratuitous observations of a factual nature made by the original court cannot have preclusive effect; the facts in question must have gone directly to the elements of the claim or defense in suit there. This is a corollary to the distinction between binding rulings of law and judicial dictum.

debt "for money ... obtained by ... false pretenses, a false representation, or actual fraud." In the Eighth Circuit, a creditor making complaint under § 523(a)(2)(A) must prove (i) the debtor made a false representation of fact, (ii) that the debtor knew was false at the time the debtor made it, (iii) that the debtor made the representation with the intent and purpose of deceiving the creditor, and that (iv) the creditor justifiably relied on the representation, (v) sustaining financial injury as a proximate result of the making of the representation. *See, In re Van Horne,* 823 F.2d 1285, 1287 (8th Cir.1987) and *In re Ophaug,* 827 F.2d 340, 343 (8th Cir.1987); and, as to the element of reliance, *Field v. Mans,* 516 U.S. 59, 74–75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

■ The State's briefed and oral argument going to these elements was very terse, and almost conclusory in its analysis. Post-hearing review of the ALJ's decision [11] shows why. The ALJ's findings do not meet any of the five elements squareon in their explicit wording. Nearly the whole thrust and focus of the decision was on the Debtor's inability to produce documentary support for the sampling of claims examined in the audit, via her regularly-maintained patient records, after the fact of the service provision and the submission of the claims. This failure of documentation is the *signal finding* in the ALJ's decision. Once this was branded as "[u]nacceptable record keeping," and therefore an "unacceptable practice" under New York's Medicaid program regulations, the ALJ built multiple inferences on it: the Debtor in fact had not performed many of the evaluative and treatment ser-

vices for which she sought and received Medicaid reimbursement; in other instances, services that she did render were not at the "comprehensive" or "intermediate" level medically indicated to evaluate and treat the conditions implied by the patients' complaints; the Debtor ordered diagnostic procedures or widely-used prescription medications when they were not appropriate to the patient complaints she described in her records; and she billed for diagnostic procedures ostensibly administered by herself, that she did not actually perform.

The ALJ's analysis comes back around, over and over, to the lack of detailed patient records. In the processes of audit and the fact-finding in the administrative review, such records were clearly to function as the sole evidence that the Debtor had in fact performed or ordered medically-necessary and -appropriate services to support her requests for Medicaid reimbursement. For want of that *documentary* evidence, memorialized contemporaneously with the service provision or order, the branding (by conclusions of law) of "unacceptable recordkeeping" was made. Then, adversely to the Debtor, the ALJ drew his multiple inferences of actual performance of excessive services, failure to perform services as stated, failure to meet recognized standards in care, and actual submission of "[f]alse claims."

The State's counsel argues that this series of "unacceptable practices" "constitutes fraud or abuse" per se. In a summarily-phrased equation, this is provided by the later version of the applicable New York State regulation, that effective June 8,

---

11. Somehow a copy of the ALJ's decision never made it into the electronically-filed supporting documents for this motion, even though the State's briefing made several references to it and even though the Debtor received it in the packet of hard-copy docu-

ments served upon her. At the Court's direction, counsel passed a copy over the bench at the hearing. This document was scanned, filed, and docketed after the hearing. It has been considered as part of the record for this motion.

1988. N.Y. Comp.Codes. R. & Regs. tit. 18, § 515.2(b).[12] That is all that the State brings forward to characterize the Debtor's submission of the claims as fraud for dischargeability purposes, "as a matter of law," via the application of collateral estoppel.

However, under New York law collateral estoppel is triggered on "an identity of issue[s] which has necessarily been decided in the prior action"—a direct linkage between facts actually and specifically found in the predicate decision, simultaneously "decisive of the present action." *Buechel v. Bain,* 740 N.Y.S.2d 252, 766 N.E.2d at 919. Clearly, to be "decisive of the present action," previously-settled findings must match to and satisfy the essential elements of a claim or defense in the current proceeding.

Here, the ALJ's findings satisfy only the first and the fifth elements of fraud under § 523(a)(2)(A). They meet the first only if one equates a provider's submission of a claim to Medicaid with a tacit representation that all of the claimed services had actually been rendered, in compliance with general professional standards and Medicaid program requirements.[13] The ALJ's finding that the claims were "false" for want of supporting documentation is sufficient to preclude the Debtor from contesting their falsity-in-fact for dischargeability purposes-even if that finding was articulated on the facial, almost tautological equation in the regulation's text, springing from a provider's failure to produce documentary support.[14] This satisfies the first element of § 523(a)(2)(A). Then, the ALJ's finding that the Debtor's "substantial[ ] violat[ion of]" Medicaid requirements for documentation of claims "result[ed] in the unnecessary expenditure of Medicaid funds" in a "substantial monetary loss to the program," satisfies the fifth element-a loss-in-fact causally related to the making of a false representation.

However, the ALJ's findings do not include any component fact that logically

---

**12.** The ALJ noted that the regulations' definitions of "unacceptable practice" were amended effective June 8, 1988. The claims sampled for the audit spanned this effective date. The inquiry into "billed services" covered 100 patients serviced between January 1 and October 31, 1988; the sampled "ordered services" were procured between June 6, 1988 and January 9, 1989. As quoted by the ALJ, the descriptions of proscribed acts later denominated "false claims" and "unacceptable recordkeeping" are essentially the same as the pre-amendment text of the regulation.

**13.** It is fair to make this equation. *E.g., In re Hultman,* 263 B.R. 402, 405–406 (Bankr. D.Conn.2001) (debt of operators of long-term care facility to state, consequent to state court finding that operators had "knowingly and willfully made false misrepresentations of material fact" in annual cost reports, resulting in overpayments by Medicaid program, is actionable and nondischargeable under § 523(a)(2)(A)); *In re Cassidy,* 213 B.R. 673 (Bankr.W.D.Ky.1997) (dischargeability of components of physician's debt to state arising from Medicaid and Medicare program overpayments to him analyzed under § 523(a)(2)(A)); *United States v. Stelweck,* 108 B.R. 488, 493–496 (E.D.Pa.1989), *aff'g* 86 B.R. 833 (Bankr.E.D.Pa.1988) (content of typed additions to forms for Medicare reimbursement submitted by maker and seller of medical devices analyzed as false representations within scope of § 523(a)(2)(A)).

**14.** The administrative appeal process gave the Debtor her opportunity to prove that the claims had been "true," i.e., based on bona fide provision of competent and necessary services, despite the Department's conclusion that they were false because her contemporaneous patient records did not support them. She had the right to bring forward additional evidence to counter the Department's conclusion; but clearly, she did not carry her burden of production of evidence before the ALJ. Thus, the ALJ's decision involved actual fact-finding based on an evaluation of evidence before him; it was not based on the regulation's semantic equation alone.

matches the subjectively-oriented elements of fraud under § 523(a)(2)(A): contemporaneous knowledge of falsity, intent to deceive, and actual and justifiable reliance. Indeed, it is as if the ALJ took pains *not* to reach these issues.

The State's only argument toward satisfying these elements via the administrative decision is that, in the nature of a definition, the regulation equates the submission of a false claim with "fraud or abuse." But, under the regulation a "false claim" is established only with respect to *de facto* falsity. A finding of falsity is virtually mandated if a provider-participant cannot document challenged claims, after the fact. The submitting provider's *knowledge* of this *de facto* falsity, contemporaneous with the claim's submission, is not a prescribed element under the regulation. Neither is an intent on the part of the provider to get a payment when he knows he is not entitled to it. The ALJ did not have to reach these points of fact, and he did not reach them.

The case that the Department made in the administrative process had nothing to do with the most central, concrete facts material to a claim of actual fraud, as it is understood under general law. Thus, the factual platform that the State used to push for summary judgment does not even speak to most of the essential elements under § 523(a)(2)(A). It cannot be said that there is no genuine issue of material fact, because the record contains no basis at all for findings as to several of these

elements. The State's motion as to this count must be denied.

The State's motion meets the same fate as to its count under § 523(a)(6), and for the same reason.

 Nondischargeability under § 523(a)(6) flows from acts analogous to intentional torts, i.e., the infliction of a detriment, the causing of a loss, where the actor intended the act of infliction and its consequences. *Kawaauhau v. Geiger*, 523 U.S. 57, 61–62, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998); *In re Patch*, 526 F.3d 1176, 1180 (8th Cir.2008). A large doubt about this count arises on that very threshold: the State has not identified any specific variety of intentional tort under the common law that would apply to the acts in question here. As framed so far, the circumstances logically go to the sort of act already comprehended by § 523(a)(2)(A)—the parlaying of some sort of lie to induce the State to give something to the Debtor when she was not entitled to receive it. Though fraud or misrepresentation is often identified as an intentional tort, it is already covered by its own dischargeability provision. Without an identifiable analog under common law different from the cause of action for fraud that is already redressed by § 523(a)(2)(A), the State's argument does not give any convincing warrant for stretching the substantive ambit of § 523(a)(6). *See In re Neumann*, 374 B.R. 688, 711 (Bankr.D.Minn.2007).[15]

---

**15.** *But see In re D'Amato*, 341 B.R. 1 (8th Cir. BAP 2006). The *D'Amato* panel analyzed a debtor's act of "intentionally using fraudulent BBB reports to sell bogus memberships" as a "willful and malicious injury" under § 523(a)(6). In doing so, it seems to have just tracked the assumptions of the trial court, as to the substantive governance for a determination of dischargeability for those facts. It gave no articulated thought to whether § 523(a)(6) is even triggered where the cir-

cumstances of the alleged wrongdoing match the common understanding of fraud, but do not implicate any other tort or another cause of action under the common law. (Unfortunately, some of the citations and parentheticals at the end of n. 17 of *D'Amato*, 341 B.R. at 6, could be read to an opposite conclusion. But this verbiage does not flow logically from the subject treated in the corresponding text; it is better treated as surplusage.)

One can set aside that abstract but potent consideration, and the gap in the State's presentation still yawns. The ALJ made no findings that go to either of the intent elements of § 523(a)(6), willfulness and malice.[16] A plaintiff under § 523(a)(6) must prove both of these elements. *In re Porter,* 539 F.3d at 893; *In re Scarborough,* 171 F.3d at 641.

Thus, the State's win in the administrative forum does not give it a basis for summary judgment in its favor on this count, either.

The State is not entitled to summary judgment on its remaining count, either. In that one, it relies on 11 U.S.C. § 523(a)(4). This statute excepts from discharge "any debt ... for fraud or defalcation while acting in a fiduciary capacity."

■■■■■■ The State acknowledges the Eighth Circuit precedent under § 523(a)(4). Under that authority, the predicate fiduciary relationship requires an "express trust," established before the action of the debtor that harmed the creditor, or at least the existence of a set of strictly defined legal duties to avoid self-dealing, under an objectively-manifested, preexisting, and binding relationship. *Hunter v. Philpott,* 373 F.3d 873, 875–877 (8th Cir.2004); *In re Cochrane,* 124 F.3d at 984, *aff'g* 179 B.R. 628 (Bankr.D.Minn. 1995); *In re Shahrokhi,* 266 B.R. 702, 707–708 (8th Cir. BAP 2001). The existence of

this fiduciary relationship is a question of federal law. *Hunter v. Philpott,* 373 F.3d at 876; *In re Cochrane,* 124 F.3d at 984. The requirement is not satisfied by basic facts that would merit the imposition of a constructive trust *after* an act of wrongdoing, under nonbankruptcy law. *Hunter v. Philpott,* 373 F.3d at 877; *In re Long,* 774 F.2d 875, 878 (8th Cir.1985).

■■■■ To make out a fiduciary relationship between the Debtor and itself, the State relies on two things alone. First, there is the established fact that the Debtor, as a provider, received substantial monies from the Medicaid program via her applications, and only later had the propriety of her receipt challenged by the State. Then, the State cites a line of decisions by the New York State appellate courts, to the effect that the State's payment of Medicaid funds to providers is "deemed provisional until an audit has been performed and completed and an opportunity to object has been afforded the provider." *State of New York v. Hollander,* 245 A.D.2d 625, 664 N.Y.S.2d 862, 864 (N.Y.App.Div.1997) (citing *Cortlandt Nursing Home v. Axelrod,* 66 N.Y.2d 169, 495 N.Y.S.2d 927, 486 N.E.2d 785 (1985) and *State of New York v. Franklin Health Lab. Inc.,* 229 A.D.2d 641, 645 N.Y.S.2d 139 (N.Y.App.Div.1996)). As the State would have it, the "deemed provisional" status makes "[t]his relationship one of a

---

**16.** Section 523(a)(6) excepts from discharge "any debt ... for willful and malicious injury by the debtor to another entity or to the property of another entity." Under the tightest and most evocative appellate formulation locally-applicable, willfulness is an intent to cause an "injury," i.e., to invade a legally-protected interest of the plaintiff. Malice is an intent to cause the resultant "harm," i.e., the loss or detriment in fact, or at least an intent to go forward where "the harm was substantially certain or nearly certain to result." *In re Stage,* 321 B.R. 486, 492–493 (8th Cir. BAP 2005) (citing Restatement (Second)

of Torts, §§ 8A, 7(1), and 7(2)). *See also In re Geiger,* 113 F.3d 848, 852 (8th Cir.1997), *aff'd,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (willfulness is manifested by a "deliberate or intentional invasion of the legal rights of another, ... [a] legal injury in the technical sense"); *In re Langeslag,* 366 B.R. at 58–59 (Bankr.D.Minn.2007) (applying *Stage* ); *In re Dziuk,* 218 B.R. 485, 487 nn. 3 and 4 (Bankr. D.Minn.1998). The Eighth Circuit recently revoiced its standard with very much the same thought, though it did not cite or quote the Restatement directly like the *Stage* panel had. *In re Porter,* 539 F.3d at 893–895.

fiduciary kind because New York State must rely on the documentation of its Medicaid providers when it disburses Medicaid funds." And that is all that the State offers by way of abstract theory.

Under the Eighth Circuit precedent, this argument is grossly off the mark. None of the New York appellate decisions denominates a provider-recipient as a trustee of Medicaid funds disbursed to it, or as a fiduciary over them, in so many words. The State does not cite to any aspect of New York law that requires the escrow or segregation of the funds, or any other measure that would amount to the creation of a trust *res*. The New York courts' sole pronouncement as to the status of funds in the hands of the provider post-receipt is that they are "provisionally" disbursed, with some sort of corresponding status to persist during the period of time when the State may audit the provider's original claims. This single word does not implicate an express trust over the funds, impressed as of the date of the provider's receipt. If it did, the provider would have no right to expend the funds during the interim period, to support its own operations in the provision of healthcare.

If the State's suggested characterization were carried through its logical implication, a provider would have to retain the funds in some sort of escrowed status for an extended period.[17] There is no express provision for such a relationship in any New York State regulation, and for a perfectly good reason: were it there, it would be impossible to enlist medical providers for program participation. Under such draconian restrictions, no physician's practice could maintain reliable, actual cashflow from Medicaid-funded services.

The decisions' characterization of a provider's receipt as "provisional" clearly protects the options of New York's Medicaid program administrators to enforce the requirements governing physician service provision, after the fact of provision. However, the use of that adjective has more connotative effect than denotative. In a general way, it defuses a potential defense to an action for recovery of overpayments, that the original disbursement is final when made and is irreversible due to the provider's reliance on the finality. Clearly, the New York courts recognized that any system disbursing funds to third parties on account of the mass provision of services to very large numbers of recipients of government largess cannot possibly review every provider's reimbursement claim for its propriety, as it is submitted. The program administrators assume compliance on the part of providers, rely on that, and disburse; the control for noncompliance is the possibility of audit, and the consequence is liability back to the State on account of noncomplying past participation.

Thus, as the *Franklin Health Lab.* court put it, a later-adjudged "overpayment ... would require [the provider] to *reimburse* [the State] for the overpayment." 645 N.Y.S.2d at 140 (emphasis added). The choice of verb here was no accident. It does not denote the recapture of segregated funds still held in a previously-established, sequestered status, but rather the rectifying of a later-determined overpayment via satisfaction from other funds not

---

**17.** Under the regulatory scheme in effect for the provider-participant in *Cortlandt Nursing Home,* the State could perform a provider audit up to six years after the provider's filing of "required fiscal and statistical reports."

The record at bar does not reflect the audit period applicable to the Debtor's program participation; but it is not disputed the Debtor was subject to one.

to be traced from the original disbursement.

So there was no express trust here. Nor was there an analog to the attorney-client relationship held sufficient to impress fiduciary status under § 523(a)(4) in *Cochrane*.[18] And finally, the attachment of denotative effect to the adjective "provisional" in context would retroactively characterize the funds as having been the State's due all along. This would equate to the imposition of a constructive trust after the fact, and Eighth Circuit precedent expressly rejects that.

So the State is not entitled to summary judgment on the remaining count either. With that conclusion,

IT IS HEREBY ORDERED that the Plaintiff's motion for summary judgment is denied in its entirety.

18. As explained by the several courts that ruled in *Cochrane*, that relationship was governed by a general, but very strict, legal prohibition: an attorney may not usurp options and opportunities belonging to the client, a protected beneficiary bound to the attorney in a confidential relationship marked by long-standing common-law duties and rights. *In re Cochrane*, 179 B.R. at 634, *aff'd*, 124 F.3d at 984.