In re Ronald Frank DUY, Sr. and Rita Louise Duy, Debtors.

PLM Lake & Land Management Corp., f/k/a Lake Weed–A–Way, Inc., f/d/b/a Professional Lake Management, a Michigan Corporation, and Gregory Cheek and Jessica Cheek, Individuals, Plaintiffs,

v.

Ronald Frank DUY, Sr., Defendant.

Bankruptcy No. 10–51693.
Adversary No. 11–5008.

United States Bankruptcy Court, D. Minnesota.

Dec. 28, 2012.

Court J. Anderson, David Bradley Olsen, Stuart T. Williams, Wesley T. Graham, Henson & Efron PA, Minneapolis, MN, for Plaintiffs.

Thomas Patrick Melloy, Gray Plant Mooty Mooty & Bennett PA, St. Cloud, MN, for Defendant.

## ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

GREGORY F. KISHEL, Chief Judge.

This adversary proceeding for determination of dischargeability of debt came before the court on the Plaintiffs' motion for summary judgment and the Defendant's responsive motion for judgment on the pleadings. The Plaintiffs ("PLM and the Cheeks") appeared by their attorney, Court J. Anderson. The Defendant ("Duy Sr.") appeared by his attorney, Thomas P. Melloy. The following decision is based on the written submissions for the motions, counsel's oral argument, and the other files and records in this matter.

## INTRODUCTION

This is another dischargeability proceeding between parties who went at it for a long time in the Minnesota state court system, before the losing party filed for bankruptcy relief.

### I. Antecedent Litigation

The parties' dispute arose out of a sale of business assets to PLM.[1] The business operation was quintessentially Minnesotan in its nature: the provision of aquatic weed control by chemical means on lakes, rivers, ponds, and streams.

For some fifteen years before 2001, Duy Sr. and his wife Rita owned and operated R & J Aquatic Weed Control, Inc. ("R & J"), a company that provided such services to customers in the Brainerd Lakes region

---

1. The following recitations go to broader historical facts. Neither side disputes any of these events and circumstances; individual parties admitted most or all of them during past testimony.

of north central Minnesota. Their son, Ronald Frank Duy, Jr. ("Duy Jr.") worked for R & J, last (1997–2001) as a state-licensed "Master Applicator" of chemical herbicides and pesticides in bodies of water. During that time, Duy Jr. also did lake shoreline cleaning and mechanical weed harvesting—but not chemical-based weed and pest control—through his own company, Minnesota Shoreline Restoration, Inc. ("MSRI").

In late March, 2001, R & J and PLM entered an Asset Purchase Agreement for the sale of substantially all of R & J's assets to PLM. The elder Duys executed the documents, on behalf of R & J and individually. The Cheeks, who were the owners and operators of PLM, signed on behalf of their company and individually. As part of the sale, the elder Duys executed a covenant not to compete with PLM, as to the provision of chemical-based weed control services.

Under the Asset Purchase Agreement, PLM was to make periodic payments to the elder Duys, both on the purchase price for the assets ($400,000.00) and on commissions under an agreement for post-sale consulting. PLM made these payments through April, 2002.

In very early 2002, Duy Jr. started preparing to enter the chemical-based aquatic weed control business. As his vehicle, he used his preexisting corporation, MSRI.

He had not previously engaged in that sort of service provision through MSRI.

Duy Jr. began such operations in the spring of 2002. In his early solicitations for business, he intentionally contacted "a large percentage" of the lakeshore property owners who appeared on R & J's customer lists and he used R & J's operational procedures. All this information had been identified for the asset sale as property to be acquired by PLM. All of it was to be subject to restrictions of use by the elder Duys, under the rubrics of confidential information and non-competition.[2]

Duy Jr.'s activities came to the attention of the Cheeks. PLM stopped making payments to the elder Duys under the Asset Purchase Agreement. PLM also issued a cease-and-desist demand to the Duys.

The first move in litigation was by the elder Duys in 2003. The elder Duys sued PLM and the Cheeks in the Minnesota State District Court for the Ninth Judicial District, Crow Wing County, under a breach of contract theory, for discontinuing payments to them. PLM and the Cheeks counterclaimed and made third-party claims against MSRI. They sought damages and other relief under theories of breach of contract and intentional interference with contractual relations.

Ultimately, Duy Sr. and his co-parties lost before a jury. PLM and the Cheeks received a verdict on their counterclaim for $352,815.00 in damages.[3] The Crow

---

**2.** *See Covenant Not to Compete,* term 2, on p. 2 (attached as Exh. C to Aff. of Ronald Frank Duy, Sr., p. 21 of Duy Sr.'s motion for judgment on the pleadings [Dkt. No. 12]). *See also* Term 7.1.4 of *Asset Purchase Agreement* (attached as Exhibit A to same affidavit, p. 28 of motion) ("It is acknowledged . . . that it is the intention of the parties that the rights of the Buyer in and to the purchased accounts, trade, business, work and customer relations be protected as property, both tangible and intangible, of the Buyer."). Duy Jr. admitted doing these things in 2003. *See* Tr. of Depo.

of Ronald Duy, Jr. (Aug. 12, 2003), at 160–161 (attached as Exhibit A to Affidavit of Court J. Anderson, pp. 51–52 of PLM's and the Cheeks' motion for summary judgment [Dkt. No. 11]).

**3.** The jury trial was held after long litigation in which both sides suffered successive reverses. On two separate occasions, the trial court ordered judgment on motion in favor of Duy Sr. and his co-parties. Both times money judgments were granted to Duy Sr. and his co-parties on their claims against PLM. Both

Wing County District Court later awarded PLM and the Cheeks $494,204.37 in attorney's fees, and $21,220.70 in costs. The end-result was the entry of a judgment against Duy Sr. and his co-parties in the amount of $868,240.07. None of the parties who lost under this judgment took an appeal.[4]

## II. This Adversary Proceeding; Motions at Bar

After the entry of judgment, Duy Sr. filed for relief under Chapter 7 on December 15, 2010. PLM and the Cheeks timely commenced this adversary proceeding. PLM and the Cheeks seek to have the adjudicated debt excepted from discharge in Duy Sr.'s bankruptcy case, in its full amount. Their theory of nondischargeability sounds under 11 U.S.C. § 523(a)(6); they maintain that the debt is one "for willful and malicious injury by [Duy Sr.] to [them] or to the property of [them] . . .," within the meaning of that statute.

PLM and the Cheeks now move for summary judgment. As movants, they must demonstrate the lack of genuine dispute as to any material fact. Fed.R.Civ.P. 56(a), *as incorporated by* Fed. R. Bankr. P. 7056. To do that, they invoke the doctrine of collateral estoppel.[5] They argue that the underpinnings of the state court judgment conclusively establish all of the factual elements for nondischargeability under § 523(a)(6).[6]

In response, Duy Sr. insists that the factual premises for the jury verdict did not reach the sort of intent contemplated by § 523(a)(6). Via his cross-motion, he seeks dismissal as to at least one component of the debt. For that, he argues that the findings in the state court conclusively undercut a case for nondischargeability. In the alternative, he argues, he may still defend this adversary proceeding on its merits under § 523(a)(6)—as bound as he may be by the fixing and liquidation of a debt under the judgment. In any case, he insists, the Plaintiffs' motion should be denied.

■ The methodology to treat the motion by PLM and the Cheeks is well-established. Collateral estoppel may be applied in a dischargeability proceeding in a bankruptcy case. *Grogan v. Garner,* 498 U.S. 279, 285 n. 11, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The Eighth Circuit Court of Appeals has expressly recognized its applicability to proceedings under § 523(a)(6). *In re Porter,* 539 F.3d 889, 894 (8th Cir. 2008); *In re Madsen,* 195 F.3d 988, 989 (8th Cir.1999).

times PLM and the Cheeks were denied all relief on their counterclaims. The Minnesota Court of Appeals reversed both judgments. Finally, the matter went to trial and the jury reached the opposite outcome. *See* Memorandum to Order for Judgment and Judgment, *Duy, et al v. Lake Weed–A–Way, Inc., et al.,* File No. 18–C1–03–382, at 5–7 (Minn. State Dist. Ct., Crow Wing County, July 13, 2010) [Exh. D to Stipulation on Admission of Documentary Evidence for Cross Motions [Dkt. No. 10]]. (The memorandum contains a careful treatment of many issues. It will be denoted "the State Court's Memorandum" hereafter.)

4. Jointly with its award of attorney's fees and costs, the Crow Wing County District Court

denied the Duys' motion for judgment as a matter of law, new trial, or amended findings. The State Court's Memorandum was entered in disposition of these requests. Many of the previous recitations are taken from its summarization of the evidence before the state court.

5. Collateral estoppel is also known as issue preclusion.

6. On a motion for summary judgment, the movant has the initial burden to identify all parts of the record that evidence the lack of a triable dispute of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ Collateral estoppel will bind a debtor-defendant to findings made on discrete issues of fact that were made in pre-bankruptcy litigation on the underlying debt. *See Montana v. U.S.*, 440 U.S. 147, 153–154, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). Where the forum of the original adjudication is a state court, the law of that forum furnishes the rules for issue preclusion. *In re Scarborough*, 171 F.3d 638, 641 (8th Cir.1999). *See also, in general, Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985); *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 481–482, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982); *Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). For the matter at bar, the framing of collateral estoppel by the Minnesota Supreme Court does not materially differ from the four-element test long articulated by the Eighth Circuit in dischargeability matters. *Compare In re Porter*, 539 F.3d at 894 *with, e.g., Northwestern Nat'l Life Ins. Co. v. County of Hennepin*, 572 N.W.2d 51, 54 (Minn.1997).[7] As a result, virtually all of the analysis in our circuit's extant case law on dischargeability applies to the matter at bar.

If collateral estoppel is to be applied, the factual premises of the prior judgment are key. The basis of the judgment lay first in the jury's answers of "Yes" to two special interrogatories:[8]

QUESTION 3

Did Ronald Duy, Sr., ... breach [his] contract with Gregory R. Cheek, Jessica Cheek, and/or PLM by violating the non-compete and/or confidentiality provisions of [the] contract?

. . . .

QUESTION 5

Did Ronald Duy, Sr., ..., without justification, interfere with Gregory R. Cheek's, Jessica Cheek's, and/or PLM's contracts, economic advantage, and/or relationships with their customers or prospective customers?

The jury then found that PLM and the Cheeks were entitled to damages of "0.00" on their claim for breach of contract, and damages of "352,815" on their claim for "interference with contracts, economic advantage and/or relationships with their customers or prospective customers up to the time of trial."

On the basis of those answers, the presiding judge entered findings of fact as follows:

3. That Plaintiff[ ] Ronald Duy, Sr., ... breached the non-compete and/or confidentiality provisions of [his] contract with Defendants Gregory R. Cheek, Jessica Cheek, and PLM.

7. Under the case law of both jurisdictions, the elements of collateral estoppel include: (1) that the party to be precluded was a party to the earlier lawsuit, or in privity with a party to it; (2) that the issue in question in the second suit is the same as the one on which a finding was made in the first; (3) that the issue in question was actually litigated in the earlier suit; and (4) that the issue was determined by a "valid and final judgment." Each jurisdiction's enumeration has a fifth element. The Eighth Circuit's is that "the determination in the prior action must have been essential to the prior judgment." *In re Porter*, 539 F.3d at 894; *Lovell v. Mixon*, 719 F.2d 1373,

1376 (8th Cir.1983). Minnesota's is that the party to be estopped had a "full and fair opportunity to be heard" on the issue in question. *E.g., Johnson v. Consol. Freightways, Inc.*, 420 N.W.2d 608, 613 (Minn.1988). Given the parties' long litigation before Duy Sr.'s bankruptcy filing, there is no conceivable dispute as to that.

8. For the sake of clarity, these quotations omit the names of all co-parties of Duy Sr., who were also subject to the counterclaims. The special verdict form is at pp. 16–19 of the Stipulation on Admission [Dkt. No. 10].

4. That Defendants Gregory R. Cheek, Jessica Cheek, and PLM are entitled to no recovery for the breach of the non-compete and/or confidentiality provisions of the contract by Plaintiff[ ] Ronald Duy, Sr., . . . .

5. That Plaintiff[ ] Ronald Duy, Sr., . . ., without justification, interfered with Gregory R. Cheek's, Jessica Cheek's, and/or PLM's contracts, economic advantage, and/or relationships with their customers or prospective customers.[9]

Duy Sr. and his co-parties then brought a motion in the alternative for judgment as a matter of law, a new trial, or amended findings. In a 22–page order and memorandum, the state court denied that motion. It also awarded attorney's fees and costs to PLM and the Cheeks. The request to override the jury verdict and judgment was denied for various reasons; but fundamentally it was because the jury's verdict and its award of damages were "within reason and consistent with the evidence presented at trial." *See* State Court's Memorandum at 8.

## DISCUSSION

For their motion, PLM and the Cheeks structured their argument solely on the intent elements. They did not distinguish among the three component awards that made up the state court's judgment.

Duy Sr.'s response made it a lot more complicated. He tried to drive a distinction between the award of damages on the one hand and the award of attorney's fees on the other. He argued that these components had a crucial difference in their legal origin, further evidenced by the jury's split disposition of the two main substantive claims made by PLM and the

Cheeks. Duy Sr. insists that the two components require different analyses on any determination of dischargeability. After that, he argues that the outcome in the state court was so facially ambiguous on the issue of intent that it could not possibly be deemed determinative of either factual issue. Hence, he argues, the state court's decision is not preclusive.

To some extent, Duy Sr.'s arguments throw up nonexistent complications. But, yes, the application of collateral estoppel to the outcome of a jury trial in a pre-bankruptcy lawsuit, to questions of intent in a dischargeability context, presents significant analytic challenges where the original trial court's formal enunciations do not directly match to the vocabulary of applicable bankruptcy law. These challenges can be met, but the process gets involved. *In re Langeslag*, 366 B.R. 51, 59 (Bankr. D.Minn.2007).

Duy Sr. presents a welter of issues. This contrasts with the simpler arguments made by PLM and the Cheeks. So, there are several ways to organize the treatment of the two motions. The most accessible is to split the judgment-evidenced debt into its three components, and to treat each separately on the question of whether the state court's fact-finding and rulings meet the requirements for nondischargeability. Each side's contentions are best and most comprehensibly addressed in reference to the specific component debt, rather than treating each side's motion as a whole but separately.

██ The source material for the application of issue preclusion is the jury's answers to special interrogatories; the trial judge's findings based on them; and the

---

**9.** These findings are recited at p. 2 of the state trial judge's decision, p. 21 of the Stipulation on Admission [Dkt. No. 10]. Again, the names of all co-parties of Duy Sr. are omitted, for the sake of clarity.

State Court's Memorandum. These documents embody the final settling of fact issues that took place in the earlier litigation. Where such memorializations in the state court do not facially match to the conceptual vocabulary of applicable bankruptcy law, the way in which the trial judge framed the submission of the issues to the jury may nonetheless establish preclusiveness for the jury's determinations. *In re Langeslag,* 366 B.R. at 60 (where jury verdict was not based on completely differentiated findings, it may nonetheless be inferred that jury made such findings if presiding judge's instructions did not logically permit a verdict based on any other set of found facts).

### I. Jury's Award of Damages

■ The threshold question is whether the findings from the Crow Wing County District Court, in their original context, satisfy the elements of § 523(a)(6)—i.e., that the award of damages was made on "a debt[ ] ... for willful and malicious injury" inflicted by Duy Sr. on PLM and the Cheeks, or on their property. In applying § 523(a)(6) on its merits, it is necessary to "first determine exactly what 'injury' the debt is 'for,' and then determine whether the debtor both 'willful[ly] and malicious[ly]' caused that 'injury.'" *In re Patch,* 526 F.3d 1176, 1181 (8th Cir.2008) (alterations in original).

After the trial in the state court, the jury's verdict and the trial judge's findings fixed and liquidated a debt, in the form of the award of damages. For that component debt, the "injury" was Duy Sr.'s interference with the "contracts, economic advantage, and/or relationships" that PLM and the Cheeks were to have with "the customers or prospective customers" of their weed control business.

To isolate the nature of that interference, it is crucial to recognize that PLM was expanding its business into a new geographic location by purchasing business assets built up by R & J during its prior operation there—in particular, R & J's established relationships with longer-term customers. Interference with such legal and factual relationships and advantages is tortious under Minnesota law, if it was "without justification." *Kallok v. Medtronic, Inc.,* 573 N.W.2d 356, 362 (Minn. 1998). In making its finding of interference, the jury recognized that Duy Sr. had inflicted an "injury" on PLM and the Cheeks. *In re Porter,* 539 F.3d at 894; *In re Geiger,* 113 F.3d 848, 852 (8th Cir.1997), *aff'd,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) ("injury" under § 523(a)(6) means "invasion of the legal rights of another ... [it] usually connotes legal injury ... in the technical sense"). In granting the award of damages, the jury recognized that the injury was compensable.

Those things are not in controversy between the parties here, as to the jury's award of damages. This motion focuses on the intent elements under § 523(a)(6), and whether the state court's adjudication satisfies them.

■ For nearly three decades, the Eighth Circuit has recognized that willfulness and malice under § 523(a)(6) are distinct states of mind, and that a complaining creditor must establish that a debtor acted with both. *In re Miera,* 926 F.2d 741, 743 (8th Cir.1991); *In re Long,* 774 F.2d 875, 880 (8th Cir.1985).[10] As binding precedent, the Eighth Circuit's formulation

---

**10.** In *Kawaauhau v. Geiger,* 523 U.S. at 60–64, 118 S.Ct. 974, the Supreme Court ratified the Eighth Circuit's prior holdings on the distinctiveness of the elements, and on the meaning of "willful."

of these elements gives the initial structure to any trial court's analysis of the record before it.[11]

■■ Under it, "willful" has been held to mean "intentional or deliberate," in the sense of "headstrong and knowing." *In re Long*, 774 F.2d at 881. When linked to the infliction of injury, willfulness is manifested by "a deliberate or intentional invasion of the legal rights of another, because the word 'injury' usually connotes legal injury . . . in the technical sense. . . ." *In re Geiger*, 113 F.3d at 852. At the stage of "willfulness," the cleaving line is between conduct redressed by the law of intentional tort, and conduct that is merely negligent or in reckless disregard of the rights of others. *Kawaauhau v. Geiger*, 523 U.S. at 64 and 61–62, 118 S.Ct. 974; *In re Patch*, 526 F.3d at 1183; *In re Long*, 774 F.2d at 879 (citing S.Rep. No. 989, 95th Cong., 2d Sess. 79 (1978); H.R.Rep. No. 595, 95th

Cong., 1st Sess. 365 (1977)). It is not enough that the debtor committed "a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. at 61 and n. 3, 118 S.Ct. 974 (emphasis in original). The claimant must show that the debtor was deliberate in invading rights of the claimant that the debtor knew were protected under law. *Id.* (debtor acts with willful intent where he commits "a deliberate or intentional injury . . . .").

■ In the earliest Eighth Circuit precedent, the concept of "malicious" is treated by using an example of circumstantial evidence that could satisfy the element: "conduct . . . targeted at the creditor . . . at least in the sense that the conduct is certain or almost certain to cause financial harm." *In re Long*, 774 F.2d at 881. *See also, e.g., In re Porter*, 539 F.3d at 894; *In re Nangle*, 274 F.3d 481, 484 (8th Cir.2001); *In re Scarborough*,

---

11. Counsel for PLM and the Cheeks structured his briefed argument by citing almost exclusively to *Langeslag*, to the virtual exclusion of binding precedent from the circuit court level. This got tiresome, but one can understand the temptation to do it. It undoubtedly appeared to be an unbeatable theory to argue to the most receptive of audiences. (The undersigned was the author of *Langeslag*. More to the point, the decision was a concerted attempt to cope with the application of collateral estoppel in an adversary proceeding under § 523(a)(6), to a jury verdict and resulting judgments; and *Langeslag* came out of pre-bankruptcy "business tort" litigation on substantive claims comparable to those made by PLM and the Cheeks against Duy Sr.) But, the heavy reliance on *Langeslag* was not wholly prudent. Syntactically, *Langeslag's* analysis was articulated directly on *In re Stage*, 321 B.R. 486 (8th Cir. BAP 2005). *Stage* was an attempt to focus and clarify the definition of "willfulness" and "malice" within this circuit by relying more directly on specific pronouncements of the Restatement (Second) of Torts. However, in opinions issued after *Stage*, the Eighth Circuit itself has not cited *Stage*. More to the point, the Eighth Circuit has not used *Stage's* articulation of a distinction between "willfulness" and "malice" that is based on the more extended, but abstract discussion in the Restatement—as illuminating as *Stage's* discussion is for a trial judge. *Cf. In re Patch*, 526 F.3d at 1182 (noting, in discussion on meaning of "willful" under § 523(a)(6), that neither Eighth Circuit *en banc* opinion in *Geiger* nor Supreme Court opinion in *Geiger* "requires strict adherence to every particular of the Restatement"). Rather, the Court of Appeals continued to use the very language of its first major decision under § 523(a)(6), *In re Long*, 774 F.2d at 881 (stating only that "malicious" conduct is "targeted at the creditor . . ., at least in the sense that the conduct is certain or almost certain to cause financial harm"). The Eighth Circuit is the one appellate tribunal with unquestioned power to issue binding precedent for the trial courts within its geographic area. Its rulings must be the first cited and their wording is the primary source of a rule of decision. As will be seen, that wording does not lack consonance with the sensibility of *Stage's* analysis; but nonetheless it is the first resort for the structuring of both argument and judicial ruling on these issues, in the lower courts.

171 F.3d at 641; *In re Waugh*, 95 F.3d 706, 711 (8th Cir.1996); *In re Miera*, 926 F.2d at 743–744 (8th Cir.1991). The thought here is more functional than theoretical; it goes to *evidence* (the nature of the debtor's behavior) that circumstantially supports an *inference* of intent to cause harm (where, objectively, the behavior is "certain or almost certain" to bring about "harm" in reality—and hence the debtor must be deemed to have known what would happen).

■ The Eighth Circuit has never cited to the Restatement's discussion of "harm" versus "injury," *cf. In re Stage*, 321 B.R. at 492–493. However, its choice of nouns can not have been inadvertent. *Long* shunts the trial court's consideration to the likelihood of "harm" *in an objective sense;* and thus "harm" has to be read as a loss or detriment in fact, of a physical or financial character. Therefore malice does come back around to an intent to cause such de facto loss or detriment to the claimant.[12] The whole point of *Long*'s formulation is that such malice can be *inferred* from the nature of a debtor's acts, even where the debtor denies that he harbored a particularized animus toward the claimant.[13]

■ As to willfulness, the state-court jury found that Duy Sr. "interfere[d]" with the "contracts, economic advantages and/or relationships with ... customers or prospective customers" that PLM was exclusively to have and use after its purchase of R & J's business assets. The verb "interfere" necessarily carries the thought of *deliberate or intentional* meddling with another party's exercise of its own rights; and so the jury could have understood the word. *See* Webster's Third New Int'l Dictionary of the English Language Unabridged (2002 ed.) at 1178 (defining "interfere" as, *inter alia,* "to come in collision: to be in opposition: to run at cross-purposes ... to enter into or take a part in the concerns of others: INTERMEDDLE, INTERPOSE, INTERVENE"; also defining "interference" as, *inter alia,* "the act of meddling in or hampering an activity or process").

But regardless, other aspects of the jury's deliberation and decision establish that its fact-finding on PLM's intentional-interference claim equated to "willfulness" under § 523(a)(6)—and to nothing else:

1. To support a verdict for PLM on that count, the jury instruction on intentional interference required the findings:

   a. that Duy Sr. "knew about the contract[s]" with R & J's customers that PLM was purchasing, and

   b. that he was aware of the prospective contractual relationships with customers that PLM anticipated from buying a geographic footprint in R & J's past service area.

2. Likewise, the jury instruction required the findings:

---

12. *See In re Langeslag,* 366 B.R. at 59 n. 11. Treated in this light, the basis for the formulation in *Long* is not all that different from that advanced by the Bankruptcy Appellate Panel in *Stage.* It is just that the issue must be addressed within the syntactic sense of the Eighth Circuit's decisions, because that is where the binding precedent lies.

13. Contrariwise, a finding of no malice can be bolstered by the lack of such inevitability. *In re Long,* 774 F.2d at 882 (where debtor's collection of pledged accounts receivable and expenditure of proceeds was contrary to security agreement, bankruptcy court's inference of lack of malice is supported by debtor's credible testimony that he intended to pay creditor from future revenue stream from business after proceeds of accounts receivable were used to support operations, and there is no evidence that that would have been impossible).

a. that Duy "interfered with or intentionally caused the breach of . . . [existing] contract[s]," and

b. that he "intentionally and improperly interfere[d] with [PLM's] prospective contractual relationship[s]" with new customers, by inducing the customers from entering or continuing the relationships or by preventing PLM from getting or continuing the relationships.

3. The jury answered in the affirmative to the special interrogatory that included the words "without justification" as a predicate for an answer of "yes" (and thus a verdict against Duy Sr. for intentional interference).

Under the wording of those instructions, the jury could not in logic have found for PLM and the Cheeks without finding that Duy Sr. had knowingly intended to invade PLM's rights and expectations from the Asset Purchase Agreement. By making an express finding of lack of justification on Duy Sr.'s part, the jury necessarily rejected any notion of a negligent, inadvertent, or even reckless invasion of those rights.

Thus, Duy Sr. is estopped from denying that he acted with willful intent toward PLM and the Cheeks in the creation of the liability underlying the judgment.

■ As to malicious intent, the outcome in the state court does not match with quite the same specificity in its facial vocabulary.[14] Nonetheless, PLM may still get the benefit of issue preclusion as to a specific fact, if the verdict in favor of PLM was supported by only one possible set of predicate findings. *In re Langeslag*, 366 B.R. at 59. *See also In re Miera*, 926 F.2d at 744 (affirming bankruptcy court's use of collateral estoppel adversely to debtor on malice element under § 523(a)(6), on conclusion that state court's judgment on action for battery "implicitly contained a finding of malice").

That inquiry requires a careful review of the trial judge's instructions to the jury, as well as the answers to the special interrogatories.[15] In this case, the configuration of claims made by PLM, their conceptual overlap, and the disposition made in a single verdict also bear on the jury's thought process in its fact-finding.

When all that is parsed, it is clear that the jury reached its verdict on findings that equate to malicious intent under § 523(a)(6), and that it could have reached that verdict only on recognizing that Duy Sr. and his co-parties acted with that intent.

An initial complication arises from the jury's finding that Duy Sr. breached his contract with PLM, specifically in its covenants of noncompetition and confidentiality, but then the jury did not award damages on account of the breach. At first glance, this is puzzling. But, it does not make the verdict as a whole ambiguous on the issue of intent, as Duy Sr. argues.

---

**14.** This is different from the record presented in *Langeslag*. There, the judge had instructed the jury that it had to find that the debtor had acted with "actual malice" toward the claimant to support a verdict of intentional interference with contractual relationship; and the state court defined malice by the purpose of the act in question, in a way that conceptually corresponded with the understandings of bankruptcy law. 366 B.R. at 60.

**15.** The underlying assumption is that the jury actually was guided by the instructions, and followed them in its review of the evidence against governing law. That assumption is appropriate, because the jury's outcome was judicially vetted. In ruling on the defense's post-trial motions, the judge concluded that there was sufficient evidence to support the verdict under the law as instructed.

More to the point, it does not mean that the finding of specific breaches of contract is irrelevant to the issue of malice.

The reason, of course, is that the jury went on to find Duy Sr. liable for intentional interference, and to award damages on that claim. Under the undifferentiated instructions for that theory of suit, the jury could have found Duy Sr. liable on three different sorts of interference:

1. with existing contracts and contractual relationships (which, in context, could only have been those with R & J's pre-sale customers, whose contracts and customer information had been sold to PLM);

2. with prospective contractual relationships (which, in context, could only have been those with renewing past customers of R & J, or with new customers in the geographic area that R & J had previously serviced); and

3. with more general economic advantage (which, in context, could only have been the "footprint" in a service area completely new to PLM, but for which R & J was selling PLM the valuable attribute of its own past presence and the advantage of taking over R & J's customer base whether exclusive to the area or not).

The jury's finding that Duy Sr. had violated the covenants of noncompetition and confidentiality linked directly into the finding of intentional interference, even though they sounded under the breach-of-contract theory. Those covenants necessarily protected PLM, as buyer, from just those sorts of interference from R & J, as seller, or any third party working in consort with R & J. Under the logic of natural causality, the breach of contract was the only conceivable predicate for liability on intentional interference—the provision to Duy Jr. of the customer information already sold to PLM and the operational procedures of R & J could only have been made by Duy Sr., who had developed both while he operated R & J. Thus, as the jury found, Duy Sr. breached the covenants himself; and that breach fostered his son's intentional interference with the complex of business opportunities that PLM had bought from Duy Sr. without Duy Sr. reserving any rights to it at all. The jury clearly found Duy Sr. liable for intentional interference in a degree equal to Duy Jr.

This web of inescapable linkage in logic bears on the issue of malice to equally inescapable effect. To find Duy Sr. liable for breach of contract under the judge's instruction, the jury had to have found that he failed "to perform an important part of the contract," i.e., the covenants of noncompetition and confidentiality—*and* "without justification." The essence of that instruction and its result in the jury's application was that Duy Sr. had no proper reason to use or disclose the information to support his son's entry into direct competition with PLM.[16]

---

**16.** The *Covenant Not to Compete,* in fact, defines as confidential "[a]ll information concerning the Business, including but not limited to customer lists and pricing information." It then provides "that such information will be kept confidential by Sellers or their agents or employees for a period of five (5) years." It goes on to bind the elder Duys to refrain from "us[ing] any of the Confidential Information for any reason or purpose other than to consummate the transactions contemplated by the Purchase Agreement," and to refrain from "duplicat[ing] or distribut[ing] the Confidential Information to anyone other than a party hereto and its agents without prior written authorization from the other parties hereto." *See Covenant Not to Compete,* term 2, on p. 2 (attached as Exh. C to Aff. of Ronald Frank Duy, Sr., p. 21 of Duy, Sr.'s motion for judgment on the pleadings [Dkt. No. 12])

The instructions on intentional interference also speak to intent. As between the two subjects of interference (with contracts and with economic advantage and customer relationships), they also required findings of a high degree of specific knowledge and intent on the part of Duy Sr. and his co-parties before liability could be affixed to them:

1. knowledge of the existing contracts in favor of PLM that were the subject of interference;

2. active interference with the performance on the contracts, or intent to cause the counter-parties to breach those contracts with PLM;

3. lack of justification for doing that;

4. intent to improperly interfere with the formation of prospective contracts in favor of PLM;

5. active inducement to prospective counter-parties to not enter into contracts with PLM; and/or

6. active prevention of the formation of contracts between PLM and future counter-parties.

Bringing this back around to the essence of malice under § 523(a)(6), it is abundantly clear that they all presuppose findings of an intent to cause a loss or detriment in fact *to PLM and the Cheeks.* The loss or damage occurred to the present and future value of the local footprint in a specific line of business, that PLM had purchased from R & J. That value was inherent in the intangible form of customer lists and information and operational procedures—which PLM had purchased from R & J, and from which it was to have the exclusive benefit under the protections of the two covenants to which Duy Sr. was bound. The loss of exclusivity, and the actual use of the information in direct (and new) competition with PLM, made the harm near-certain to occur. The tacit finding of an intent to bring about that harm *ab initio* was essential to the finding on the instructed issue, a lack of justification.

Simply stated, the jury's verdict and the resultant judgment were premised on fact-finding that PLM did not get what it paid for, and that this was the result of intentional acts of Duy Sr. and his co-parties that were directed toward that end. The overlap of the two legal theories on which liability was adjudged required findings of specific intent on their part. The verdict and judgment could only have been based on a recognition in fact that Duy Sr. intended to take back, and to exploit, something that R & J had sold to PLM. The jury instructions made specific reference to relationships that *PLM and the Cheeks* had with present and prospective customers; perforce, any interference with those relationships was "targeted at" PLM and the Cheeks, the parties who had the preexisting benefit of the relationships. That "targeting" embodies an intent to cause a harm to PLM; and that equates to malice within the meaning of § 523(a)(6). Accord, *In re Koch,* 2012 WL 4090179 (D.Minn. Sept. 17, 2012) (pre-bankruptcy judgment against debtor for violation of state trade secrets act was based on finding of malice in sense of § 523(a)(6), where debtor had chosen "to take and use" trade secrets sold by debtor's former employer to successor-employer, when debtor left employ and established competing business).

With those conclusions, Duy Sr. is estopped from denying that his debt to PLM was "for willful and malicious injury," to the extent that it was established by the Crow Wing County District Court's award of damages for intentional interference. That component of the judgment-evidenced debt is excepted from discharge, by direct operation of § 523(a)(6).

## II. Judicially–Imposed Components of Judgment

The final judgment in the state court had two other components. Both were imposed by the presiding judge after the jury rendered its verdict. Duy Sr. insists that there is no basis to except the larger such component from discharge. He does not make an explicit issue of the smaller one. For the sake of completeness, both will be discussed—but in reverse order.

### A. Award of Costs and Disbursements

▮ In the August 12, 2010 order, the state court granted judgment to PLM and the Cheeks "in the amount of $21,220.70, which amount represents the Cheeks' allowable court costs and disbursements." It expressly observed that an award of reasonable costs and disbursements to PLM and the Cheeks, as the prevailing parties, was mandated under applicable Minnesota statute. State Court's Memorandum at 21. This component liability was merged into the final judgment on the intentional-interference claim. As such, it is an "ancillary obligation" for determination of discharge in bankruptcy. *In re Hunter*, 771 F.2d 1126, 1131 (8th Cir. 1985).[17] As to such ancillary debts, "their status [as dischargeable or nondischargeable] depends on that of the primary debt." *Id. Cf. Cohen v. de la Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998) (because 11 U.S.C. § 523(a)(2)(A) excepts from discharge "any liability" arising from debtor's fraud, awards of "treble damages, attorney's fees, and other relief that may exceed the value obtained by the

debtor" via fraud are also excepted from discharge).

Here, the primary debt is the adjudicated liability on the intentional-interference claim. Perforce, the ancillary obligation of costs and disbursements is also excepted from discharge under § 523(a)(6).

### B. Award of Attorney's Fees

▮ In the same order, the state court held that the attorney-fee provision of the Asset Purchase Agreement permitted the Cheeks and PLM to recover such expenses from their opponents. The reason was that they were the prevailing parties, when the cross-allegations of violation of the Asset Purchase Agreement were presented to the jury:

> The jury found that the [elder] Duys and [R & J] breached the parties' agreement by violating the non-compete and/or confidentiality provisions of the contract.

State Court's Memorandum at 14.

After reviewing the supporting documents for PLM's attorney-fee request, the state court disallowed some $55,000.00 of claimed fees.[18] It allowed the balance claimed, of nearly $500,000.00. In opposing the award, Duy Sr. and his co-parties had argued that PLM and the Cheeks had not prevailed on most of their pleaded substantive theories of recovery, and therefore were not entitled to recover attorney's fees for the preparation and presentation of those claims. The state court expressly rejected that argument:

> While the Duys' arguments have merit, the Court cannot reduce the fee award

---

17. An award of costs and disbursements is just as much a transactional cost of dispute resolution through the litigation process, as the recoverable attorney's fees that the *Hunter* court specifically cited as "[a]ncillary obligations." In a different sense, the mandatory nature of the award under state law pretty much cements its ancillary nature.

18. It also declined to give counsel an enhancement above a lodestar-calculated figure, primarily on the basis that the litigation had not presented exceptionally difficult issues and its great length had been the result more of animosity than complexity.

when the unsuccessful and successful claims are based on the same common facts and many of the same arguments. The Cheeks' claims are so intertwined as to make it impossible to accurately separate the hours spent on them.

State Court's Memorandum at 20.

As noted earlier, in urging the application of collateral estoppel here PLM and the Cheeks did not distinguish among the components of the judgment. However, Duy Sr. used a variant of his argument to the state court, on the matter of attorney's fees. He notes that the jury did not award damages against him under the rubric of breach of contract, despite its finding that he had committed such a breach. He also notes that the state-court judge premised his award of attorney's fees against Duy Sr. on the provisions of the Asset Purchase Agreement, rather than the tort law of intentional interference with contractual relationships.[19] So, he urges that PLM's complaint be dismissed as to the award of attorney's fees. As a fallback, he insists that summary judgment be denied as to the ancillary status of the attorney-fee award—the assertion being that some portion of the attorneys' services and their associated fees links to the litigation and trial of the claim for breach of contract, rather than the claim for intentional interference; and because the state court expressly declined to make that allocation, there necessarily is a triable fact issue on it for the purposes of dischargeability.

There are two semi-articulated predicates for these positions.

The first is Duy Sr.'s assumption that the adjudication on the claim for breach of contract is, per se, free of the taint of

willfulness and malice. Per his argument, it would follow that an award of attorney's fees under the contract's provisions has nothing to do with intentional wrongdoing on his part and therefore is not ancillary. The second is Duy Sr.'s thought that the jury's election not to award damages for breach of contract means no debt at all is traceable to this legal theory. If extended as Duy Sr. urges, the services devoted to pursuing that theory alone could not give rise to an ancillary debt—because there is no main, nondischargeable debt.[20]

More explicitly, Duy Sr. relies on a notion of "election of remedies," as counsel tags it. The idea is more appropriately termed a deemed marshaling (in the state court) of PLM's grievance against Duy Sr.—with the award of damages going solely under the tort theory, and the award of attorney's fees coming solely from a contractual entitlement. Tying back into the boundaries of nondischargeability under bankruptcy law, Duy Sr. would have the latter denied the status of nondischargeability in its own right, as well as for lack of ancillary status.

This argument elides the unitary nature of Duy Sr.'s conduct throughout the relevant events. The subjects of the adjudged breach of contract were the customer information and the Duys' prior market presence, which were to be locked in favor of PLM under the covenants of noncompetition and confidentiality. Those valuable attributes were the sole instrumentality through which Duys Sr. and Jr. then engaged in the adjudged intentional interference.

Simply stated, the conduct of Duy Sr. in relation to his duty under the Asset Pur-

---

**19.** The state court did cite the latter as authority for its award of attorney's fees against Duy *Jr.* State Court's Memorandum at 14–15.

**20.** The underlying point seems to be the long-standing judicial recognition that a "simple" breach of contract does not give rise to a nondischargeable debt. *See In re Long,* 774 F.2d at 882.

chase Agreement was anything but a "simple breach of contract." It was an expropriation of property in itself, a necessary precursor to the tortious conduct that gave rise to the main liability. *See* State Court's Memorandum at 14 ("The agreement ... obligates a party who violates the agreement or any portion ..., to pay the reasonable attorneys' fees and costs that the other party incurred in the litigation. The jury found that the Duys and [R & J] breached the parties' agreement by violating the non-compete and/or confidentiality provisions of the contract."). More to the point of Duy Sr.'s broader argument, the breach-via-expropriation was as intentional and malicious as the later exploitation of the information in direct competition with PLM. The fact that the state court legally justified the award on Duy Sr.'s contractual undertaking does not make the award any less ancillary to the main debt in tort. The main debt is traceable directly back to the breach of contract, and was that breach's fruition.

The award was the result of a joint submission to a court, of two different theories of liability on a single body of fact. It descended from a verdict through which Duy Sr. was found legally culpable on both theories. With that common origin in fact, and a common channeling through one judgment, Duy Sr.'s judgment-evidenced debt for attorney's fees is ancillary to the main, tort-based debt. It, too, is excepted from discharge under the direct authority of *Hunter.*

### III. Marginal Issues

The presentations on these cross-motions featured the same sort of obtuseness and rancor that the state court observed in the original lawsuit. Both sides raised many issues other than those just treated.

Some of them are so minor that they do not even merit mention. The main ones do not affect the dispositive character of the ones just ruled on; but they require brief treatment.

### A. Duy Sr.'s Challenge to Breadth of State Court's Decision

Duy Sr. devoted a significant portion of his briefing and argument to his plaint that the trial in the Crow Wing County District Court exceeded the scope of the issues that the Minnesota Court of Appeals remanded for trial. As he would have it, the claim of PLM and the Cheeks for intentional interference was not even properly before the state court, because only the claims for breach of contract were remanded. This argument apparently was rejected before, by the state court, on that very remand; but now it is used to argue that collateral estoppel cannot even lie here. Apparently, the thought is that the verdict on intentional interference was not "essential to" a judgment on remand, under the mandate of the Court of Appeals.

■ It is not warranted to take this bait, and it certainly is not necessary to parse the decisions of the Minnesota Court of Appeals to divine their charge to the trial court.[21] As a matter of both federal and state law, a party opposing the application of collateral estoppel cannot do so by attacking the earlier judgment on the ground that the original forum committed legal error. *In re Scarborough,* 171 F.3d at 642. The reliance on finality that both underpins and serves collateral estoppel would be wholly undercut, were collateral attacks on the factual and legal merits of predicate judgments to be allowed in the context of a later action between the same

---

**21.** The two decisions were denominated as "unpublished," and hence are accessible only in electronic format: 2005 WL 1154291 (Minn.Ct.App. May 17, 2005) and 2009 WL 1919296 (Minn.Ct.App. July 7, 2009).

parties. *Id.* Duy Sr.'s argument is without merit.

## B. PLM's Preoccupation With A "Law of This Court"

With equal intensity, PLM's counsel came back again and again to the fact that Duy *Jr.* had received an adverse ruling on essentially the same arguments now made by his father. The vehicle for that defeat was PLM's motion for summary judgment in a nearly-identical dischargeability proceeding, which PLM and the Cheeks had commenced in the bankruptcy case of Duy Jr. This, counsel single-mindedly repeated, gave rise to "the law of this court." [22]

Whatever that means. The point of counsel's insistence was never really clear.

If it was that all other bankruptcy judges of this district are somehow *legally* bound by the first ruling made by a colleague on a specific issue, the notion is rather puerile—even if two such matters involved a full coincidence of relevant facts and law due to the presence of common parties and histories. Judges on a trial court sit alone on cases on their docket. The members of a trial court do not engage as a group in a collegial decision-making process on particular cases within the court's jurisdiction, toward a mutually-acceptable outcome and rationale. Only appellate courts do that, via their function through judicial panels.

Yes, judges of a trial court may elect individually and even in groups to defer to the first rulings made by a colleague, on an issue of frequent recurrence in their forum. But in the last instance, they are free to follow their own lights in responsibly carrying out their judicial oath. This means that they may disagree in their interpretations and applications of statute and precedent, even to the same bodies of fact. If one or more of them err in differing from their colleagues, the appellate courts can address that. *See, e.g., In re Tveten,* 70 B.R. 529 (Bankr.D.Minn.1987), *aff'd,* 848 F.2d 871 (1988); *In re Johnson,* 80 B.R. 953 (Bankr.D.Minn.1987), *aff'd,* 880 F.2d 78 (1989).

This line of argument, with all the stridence of its signal phrase, was an unnecessary diversion from the real and substantial issues posed by the parties.

## C. Duy Sr.'s Motion for Judgment on the Pleadings

After PLM and the Cheeks filed their motion, Duy Sr. apparently felt compelled to make his own preemptive bid for final disposition. He chose a motion for judgment on the pleadings pursuant to Fed. R.Civ.P. 12(c).[23] However, he went far beyond the four corners of complaint and answer, citing terms of the Asset Purchase Agreement and various parts of the state-court record to support his argument that PLM's bid for nondischargeability was ripe for "dismissal," at least in part.

This stretching of the scope of Rule 12(c) has some support in past judicial pronouncement. *E.g., Blonder–Tongue Labs., Inc. v. Univ. of Ill. Found.,* 402 U.S. 313, 347, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971); *Hatch v. TIG Ins. Co.,* 301 F.3d 915, 916 n. 2 (8th Cir.2002); *Porous Media Corp. v. Pall Corp.,* 186 F.3d 1077, 1078 (8th Cir.1999); *Missouri ex rel. Nixon v.*

**22.** The ruling was given, and a judgment of nondischargeability against Duy Jr. entered, in ADV 10–5041. Judge Robert J. Kressel presided over the Chapter 7 case of Duy Jr. He ruled from the bench on the motion for summary judgment there. There was no written memorandum of decision; hence the ruling did not constitute an "opinion" as counsel would have it termed. Duy Jr. did not take an appeal.

**23.** This rule is incorporated by Fed. R. Bankr.P. 7012(b).

*Coeur D'Alene Tribe,* 164 F.3d 1102, 1107 (8th Cir.1999). The point remains, however, that a cross-motion for partial summary judgment would have been a better-matched platform from which to funnel the considerations toward material extrinsic to the pleadings.

On its merits, Duy Sr.'s effort to sink his opponents' argument on collateral estoppel was just too weak. It relied on only one published decision from a trial court, for the proposition that the phrase "without justification" does not necessarily encompass willfulness and malice in the sense of § 523(a)(6).[24] As a substantive approach, this was entirely too formalistic. The reliance on one isolated, older decision, without any appellate authority, made the proposition look like a sport, and an anomaly.

And in the last instance, the whole theory of Duy Sr.'s motion rang hollow in its insistence in that the outcome in the state court was conclusively adverse to PLM and the Cheeks on their theory of nondischargeability, in whole or in part. This did not entirely jibe with Duy Sr.'s argument in opposing PLM's motion, that the factual issues as understood in bankruptcy had never been addressed in the state court. Yes, Duy Sr. had the right to make both arguments; but in either case they fail. Not only did the jury in Crow Wing County reach the same factual conclusions as bankruptcy law requires; it had to, in order to reach its verdict against Duy Sr. under the content of the instructions to it.

### OUTCOME

The Plaintiffs in this adversary proceeding have shown they are entitled to a judgment of nondischargeability as a matter of law, on the facts that were settled in the Minnesota state courts and without need of another trial here. The Defendant's motion for judgment on the pleadings therefore fails.

### ORDER

On the memorandum of decision just made,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. The Plaintiffs' motion for summary judgment is granted.

2. The Defendant's motion for judgment on the pleadings is denied.

3. The Defendant's debt to the Plaintiffs, as fixed and liquidated on August 12, 2010 in the Minnesota State District Court for the Ninth Judicial District, Crow Wing County, under the caption of *Duy, et al. v. Lake Weed–A–Way, Inc., et al.,* Court File No. 18–C1–03–382, was excepted from discharge in BKY 10–51693, by operation of 11 U.S.C. § 523(a)(6).

LET JUDGMENT BE ENTERED IN ACCORDANCE WITH TERM 3.

---

**24.** That decision was *In re Kraft,* 192 B.R. 735 (Bankr.W.D.Mo.1996).